OPINION. Arundell, Judge: The principal question in this proceeding is whether the petitioners are entitled to treat the sales of certain registered Hereford cattle during the years in issue as property used in their trade or business. If such cattle were held by the petitioners as breeding cattle, then, under the provisions of section 117 (j) (1) of the Internal Eevenue Code of 1939, as retroactively amended by section 324 of the Eevenue Act of 1951, the petitioners are entitled to treat their profits from the sales as gain from the sale of capital assets and not as ordinary income. The second question involves a consideration of the methods of farm accounting and, particularly, the determination of the construction of section 29.22 (a)-7 of Eegulations 111 which specifies the methods for computing income from farming operations. Some background is necessary for the proper appreciation of the matters in controversy. The petitioner C. A. Smith, now deceased,[4] established a registered Hereford herd in 1918 with the expectation of developing an outstanding herd. It was Ms plan to sell quality cattle to other cattlemen for use by them as breeding cattle. Through the years, the quality of his herd developed until, during the years in issue, it was recognized as one of the outstanding Hereford herds in the United States. During the years before us, the petitioner continued to develop the quality of his herd and to sell some of his animals to other breeders for use by them as breeding stock. A few animals were occasionally culled from the herd and sold for beef but this practice was unusual and such animals are not involved here. Nor are we concerned with the animals which the petitioners sold in the ordinary course of their business to other breeders for use by them as breeding stock in their herds. We are concerned only with the animals which were sold in unusual circumstances to other breeders. In the 7 years before us, the petitioner sold over 800 Herefords to other breeders. In his returns, he treated the gains from all of these as long-term capital gains. The respondent determined that all of these cattle were the stock in trade of the petitioner and were sold in the ordinary course of his business and the profits on their sale were returnable as ordinary income. Each side has receded from its original extreme position. The petitioners now contend that only 171 of the cattle sold over the 7 years involved were cattle held for breeding purposes, and concede that the remainder were held for sale to customers in the ordinary course of their business. The respondent now argues that all the raised heifers under 27 months of age and all raised bulls under 34 months of age which were sold during the years in issue were held primarily for sale to petitioners’ customers. It is now firmly established that cattle held for breeding purposes come within the definition of the term property used in a trade or business and qualify under section 117 (j) (1) of the Internal Revenue Code of 1939 for treatment as capital assets, provided they are held for the requisite period. Even before the 1951 amendment, courts and the Commissioner had recognized this. Fawn Lake Ranch Co., 12 T. C. 1139; Franklin Flato, 14 T. C. 1241; Albright v. United States, 173 F. 2d 339; I. T. 3666, 1944 C. B. 270; I. T. 3712, 1945 C. B. 176. Despite apparent agreement on this general principle, there was considerable controversy between the Commissioner, on the one hand, and the courts and cattlemen, on the other, in its application. This disagreement ultimately led to the amendment of section 117 (j) (1) by the Revenue Act of 1951. Section 324 of the 1951 Act added the provision that defined the term “property used in the trade or business,” to include: livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. The foregoing amendment is applicable to this case. It is retroactive to taxable years beginning after December 31,1941, except that the extension of the holding period from 6 to 12 months is applicable only to taxable years beginning after December 31, 1950. No issue is raised in this proceeding on the holding period of the. animals involved. It is .apparently conceded that all the animals which petitioners claim were in-the breeding herd were held by them for at least 6 months — the period required for the years in issue. The determination of which animals, if any, were held by the petitioners for breeding purposes is essentially a question of fact. As noted above, the respondent would make this determination by an age test, relying on Walter S. Fox, 16 T. C. 854, affd. (C. A. 4, 1952) 198 F. 2d 719. The age limits suggested, 27 months for heifers and 34 months!or bulls, are the minimum ages when, under the circumstances and breeding practices of petitioners, it would normally be determined whether a particular animal had.the ability to produce offspring with sufficient quality characteristics to be included in the breeding herd. The respondent points out that heifers were usually not bred at Hillcrest Farms until they were 18 months old. Allowing 9 months for gestation, it was not until she was 27 months old that it could be determined whether she was capable of producing quality calves. Bulls normally were not used for breeding until they were 15 months old. Allowing 9 months for gestation, plus an additional 8 or 9 months for the development of the calf to weaning when its quality was determined, the minimum age at which it could be determined whether a bull had desirable progeny was approximately 34 months, according to the respondent. The appeal of the respondent’s suggested criterion is in its simplicity. We adopted the age test[5] in the Fox case because we had tp make an approximation of which animals involved were part of the breeding herd. In that case, the taxpayers had relied exclusively on the fact that the registration of their purebred animals was enough to classify them as members of the breeding herd. We felt that more evidence of the purpose for which the animals were held was necessary. Howr ever, we were convinced that some of the animals involved were part of the breeding herd but, because of the state of the record in that case, we were unable to determine with respect to particular animals whether or not they were held for breeding. Therefore, we adopted the age test as a kind of rule of evidence to decide the case. On review, the Fourth Circuit held that our test was reasonable and fair in the circumstances of that case. The principal difficulty in cases of this kind revolves around the corroboration for the claims that young and immature animals are part of the breeding herd and, although physically incapable of having offspring, are nevertheless being held until they come of age and start producing progeny. It is obvious that a breeding herd must be constantly replenished with young animals to continue its vitality. In the period when the younger animals are developing, presumably their immaturity alone is not conclusively determinative of the purpose for which they are being held. That is the fault with the respondent’s proposed test; it would make immaturity conclusive. The legislative history of the 1951 amendment plainly indicates that Congress was concerned over the Commissioner’s reluctance to recognize that young animals were capable of being held as breeding stock.[6] And, the phrase “regardless of age” written into the statute indicates a clear intent to prevent age alone from being used as the criterion. As the Fourth Circuit said, in commenting on the 1951 amendment in the course of affirming our decision in the Fox case, “The important thing is not the age of the animals but the purpose for which they are held.” 198 F. 2d at 722; cf. also McDonald v. Commissioner, (C. A. 2, 1954) 214 F. 2d 341, reversing 17 T. C. 210 (1951). In this case, we have more evidence concerning the breeding operations and the farm management than we had in the Fox case. The record shows that the Hillcrest Farms herd was physically separated into two main groups, one, animals which were available for immediate sale, and the other, animals in a breeding herd. Records were kept so that at any time it could be determined which animals were in the breeding herd and which were available for sale. None of the animals in the breeding herd were available for sale in the ordinary course of business. They were held to produce calves, some of which, depending on their quality, would be added to the breeding herd as future breeding stock but most of which would be offered for sale to other breeders in the regular course of the farm’s business. The petitioners have shown that the particular animals which are involved were of extremely high quality and would not have been sold except for unusual circumstances. We are convinced especially that the younger animals were of the quality ordinarily retained by the petitioners to replenish their breeding stock and that they were held for breeding purposes at the time of their disposition. For example, the record indicates that many of the cattle involved were sold at auctions at fairs or exhibitions where the animals were displayed and had competed for awards. Each year it was the petitioners’ practice to select high quality calves and yearlings from their herd, groom them carefully, and ship them to cattle exhibitions and fairs. Permission to display and compete for awards and honors was conditioned, in most cases, on the requirement or, at least the understanding, that the petitioners would allow the animals that were exhibited to be sold at the auctions that followed the exhibition. The animals displayed at these exhibitions were outstanding young animals in the petitioners’ herd. They had to be; otherwise there would be no point in entering them in the exhibition. Sometimes, the animals which were displayed were selected by representatives of the breeding association and not by petitioners. But whether selected by petitioners or by someone else, the object was to select outstanding young animals for display in order to publicize the quality and character of the breed and petitioners’ herd. Such was the kind of animals that would have been held for future breeding purposes by petitioners. Many of the foregoing observations also apply to the animals that were sold at the two auctions held at the farm in 1945 and 1950. The animals involved here that were disposed of at those sales were of extremely high quality. These auctions were conducted largely at the urging of the representatives of the breeding association. The purpose was to create interest in the Hereford breed in the eastern part of the country. Representatives of the association, whose testimony is in the record, selected some of the outstanding young animals on the farm for inclusion in the sales catalogs. Not all the animals came from the breeding herd but, with the petitioners’ permission, some were selected from among the younger animals being held for future breeding purposes. The high quality of the animals involved is further proved by the fact that one here in issue was exported to South America to be a representative of his breed in that part of the world. Some were selected also for experimental use in the agricultural departments of prominent universities. From all of these facts, and from the entire record, we are convinced that the petitioners have proved that the animals now in issue were actually part of their breeding herd at the time of disposition, and that they were being held for breeding purposes, and they were not held primarily for sale to other breeders in the ordinary course of the petitioners’ business. Consequently, the petitioners are entitled to treat their gains on the sales of these animals as long-term capital gains. The second issue concerns only the last 3 years before us, 1948 through 1950. The question raised is the interpretation of section 29.22 (a)-7 of Regulations 111[7] which prescribes the methods for determining the gross income of farmers. The crux of the petitioners’ claim on this issue is that, although they have been regularly keeping their books and records and reporting their income on an accrual basis, in the treatment of the sale of animals which were held for breeding purposes, we should compute their income from this source as if petitioners were in fact on a cash basis. There is, of course, no authority under the law for petitioners’ proposed treatment. Finally, the parties have stipulated that the petitioners are entitled to treat gain in the amount of $8,750 from the sale of a factory in 1948 as a capital gain. The gain from the transaction had been erroneously reported as ordinary income. Effect can be given to this stipulation in proceedings under Rule 50. Reviewed by the Court. Decisions will be entered under Rule 50. Van Foss an, J., did not participate in the consideration of or decision in this report. C. A. Smith is the petitioner for the years 1944 through 1947. C. A. Smith and Lula T. Smith are petitioners for the years 1948 through 1950. Executors have been substituted for C. A. Smith. In the. float case, we held that heifers under 26 months and bulls under 34 were not part of the taxpayers’ breeding herd. S. Rept. No. 781, 82d Cong., 1st Sess., pp. 41-42. Sec. 29.22 (a)-7. Gross Income of Farmers. — * * * In the ease of a farmer reporting on the accrual basis (in which an inventory is used to determine profits), his gross profits are ascertained by adding to the inventory value of live stock and products on hand at the end of the year the amount received from the sale of live stock and products, and miscellaneous receipts for hire of teams, machinery, and the like, during the year, and deducting from this sum the inventory value of live stock and products on hand at the beginning of the year and the cost of live stock and products purchased during the year. In such cases all live stock raised! or purchased for sale shall be Included in the inventory at their proper valuation determined in accordance with the method authorized and adopted for the purpose. Also live stock acquired, for draft, breeding, or dairy purposes and not for sale, may be included in the inventory, instead of being treated as capital assets subject to depreciation, provided such practice is followed consistently by the taxpayer. In case of the sale of any live stock included in an inventory their cost must not be taken as an additional deduction in the return of income, as such deduction will be reflected in the inventory.