JAMES M. MCDONALD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 43227. Filed March 31, 1955.

*Philip M. Aitken, Esq.*, for the petitioner.
*S. Jarvin Levison, Esq.*, for the respondent.

OPINION.

BLACK, *Judge:* Respondent, in his brief, concedes that the sales during 1944 and 1945 of all cattle purchased by petitioner and held

by him for more than 6 months are entitled to capital gains treatment under the provisions of section 117 (j) of the Internal Revenue Code of 1939.[3] The only question for our consideration, therefore, is whether respondent erred in determining that the cattle raised by petitioner and sold during 1944 and 1945, after being held for more than 6 months but prior to their reaching 24 months of age, were held "primarily for sale to customers in the ordinary course of his [petitioner's] trade or business." If respondent's determination is correct the proceeds of those sales constitute ordinary income, not capital gains under section 117 (j). Petitioner must bear the burden of proving that respondent erred in his determination.

Whether or not the cattle in question were, under section 117 (j) (1), held "primarily for sale," as determined by respondent, or "held * * * for * * * breeding, or dairy purposes," as contended by petitioner, is a question of fact. *Estate of C. A. Smith*, 23 T. C. 690. This Court considered the identical question, applicable to this petitioner's 1946 tax year, in a prior proceeding reported in 17 T. C. 210. In that case we held, on the basis of the record there before us, that the cattle raised by petitioner and sold when they were 24 months of age or less (the approximate age at which their first offspring would be born) were held primarily for sale and the proceeds of those sales were, therefore, not entitled to capital gains treatment.

In the course of our Opinion in the earlier case, we stated:

While there was always the possibility that any individual bull calf might ultimately become a part of petitioner's breeding herd, it is obvious that most of the bull calves born would be sold whether they were good enough for petitioner's herd or not. * * *

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * * Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. * * *

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *

[The sentence last quoted in section 117 (j) (1) above was added by section 324 of the Revenue Act of 1951 and made retroactive to taxable years beginning after December 31, 1941, with the exception that the extension of the holding period from 6 to 12 months was made applicable only to taxable years beginning after December 31, 1950.]

It is true that the standards for petitioner's herd were high. But we think the evidence establishes that those standards were set for the bona fide purpose of improving petitioner's herd and that if a particular animal met those standards it *would* be retained. We are drawn to that conclusion by our findings (a) that petitioner's Guernsey herd was in fact one of the best in the country; (b) that there was no predetermined limit on the size of the herd and there was sufficient acreage for the herd to increase; (c) that during the years in issue the size of the herd increased from 487 to 523 head; and (d) that, as evidenced by petitioner's continual losses from his farm operations, he was willing to incur considerable expense to develop a herd of the highest quality.

On July 7, 1954, our decision in the prior case was reversed by the Court of Appeals for the Second Circuit, *McDonald* v. *Commissioner*, 214 F. 2d 341. The Court of Appeals, obviously referring to the above-quoted sentence of our Opinion, plus the added statement therein that "it is apparent that petitioner never expected or intended to incorporate into his breeding herd all bull calves born on the farm," commented as follows:

it was always clear and predictable that each year substantial numbers of them [cattle] would eventually be culled and sold. It was this predictability which led the Tax Court to the view that the young animals were held for sale up to the point where their breeding qualities had been tested by examination of their offspring. This period of time it fixed at 24 months; and so it held the proceeds of cattle sold earlier to be only income.

 \* \* \* \* \* \* \*

We think, however, that this view penalizes breeders with skill sufficient to detect and cull inferior animals even before they have been bred. True, an affirmative judgment that an animal is superlative cannot be made without examination of its offspring. But the evidence is compelling that a negative judgment can often be made on the basis of such factors as brightness of eyes, width of nostrils, size of muzzle, length of neck, sharpness of shoulders, depth of chest and spring of ribs, straightness of back, width and level of rump, and, in the case of a cow, size of udder and its firm attachment to the body. Thus younger animals can be accurately culled, and the animals which the taxpayer sold were selected in this manner. Before an animal had been thus weeded out it was part of the regular herd, held for dairy and breeding purposes until it should prove unfit. See *O'Neill* v. *United States*, D. C. S. D. Cal., Vol. 5 CCH, 1952 Fed. Tax Rep. ¶ 9462, affirmed *United States* v. *O'Neill*, 9 Cir., 211 Fed. (2d) 701; *Pfister* v. *United States*, D. C. S. D., 102 Fed. Supp. 640, reversed on other grounds *United States* v. *Pfister*, 8 Cir., 205 Fed. (2d) 538.

Of course it was in the taxpayer's contemplation that many or most of the animals would be found wanting and be sold. The operation might perhaps even have proved unfeasible without the income thus derived. And in a very real sense the taxpayer could have said at any moment that most of his calves were held for possible sale. But this was not the motive behind their retention

and legislative history of the new law [⁴] shows that motive is to be controlling. And it is this new law which is and must be decisive.

Although the Court of Appeals' decision is binding upon us in the prior case, it having established the law of that case, we are not compelled to follow it in the case now before us if we think it is wrong, however much we may respect the views of the Second Circuit. The reasons why our Court must endeavor to have a uniform treatment equally applicable as nearly as possible to all 48 States of the Union and equally applicable in all the United States Courts of Appeals is stated at some length in *Estate of William E. Edmonds*, 16 T. C. 110, 117. See also *Albert L. Rowan*, 22 T. C. 865, 873. Having this rule in mind, after careful consideration of the record which details every phase of petitioner's operations, we conclude that our decision must, under the facts before us, accord with that of the Court of Appeals in the prior case.

We are persuaded that all the raised calves here in controversy were held for breeding or dairy purposes within the meaning of section 117(j)(1). It is not necessary that an animal reach maturity and produce a calf for it to fall within the wording of that section. The animal need not have been actually put to the prescribed use if it was in fact *held for the purpose of being put to that use*. *McDonald* v. *Commissioner, supra; Fox* v. *Commissioner*, (C. A. 4) 198 F. 2d 719, affirming 16 T. C. 854; *Estate of C. A. Smith, supra.* Actual use, of course, is an evidentiary factor to be taken into account in determining the factual question of the purpose for which the animal was held, but it is not the sole determinative. Moreover, we agree with the Court of Appeals in the prior case that it cannot be said that the raised calves were held primarily for sale merely because it could be predicted that some would be sold each year.⁵ See also *United States* v. *Bennett*, (C. A. 5) 186 F. 2d 407.

Neither is it fatal to petitioner's case that the greater part of the income from the farm operations was derived from sales of the cattle in question. Though that circumstance does weigh against petitioner we think it is counterbalanced by other factors present. The animals in question were sold at all ages rather than at the earlier ages only, indicating that their disposal was motivated not by a desire for profit

---

⁴ Sec. 324. Revenue Act of 1951, amending sec. 117 (j) (1) of the 1939 Code. See footnote 3.

⁵ In this connection the Court of Appeals said further:

we disapprove the view that an animal is held for breeding purposes only if there is an expectation and intention that it produce offspring. Life is replete with situations (advertising, war, reproduction) where many are employed in the hope that one will succeed. Yet the purpose subserved by the many is clear. This does not mean that every farmer can obtain the benefit of the capital gains provision for his entire calf crop merely by selecting one of the better looking animals every time he needs a replacement for his producing herd. This taxpayer, however, has made a thoroughly convincing record that his retention of calves was a necessary factor in building his champion herd. He is entitled to the benefit of I. R. C. § 117 (j) (1) in its new and revised form.

from such sales but, rather, because of their unfitness for the breeding and dairy purposes held. See *McDonald* v. *Commissioner, supra,* footnote 1. Further, petitioner's seeming willingness to incur continual losses from his operation, when it appears that those losses might have been eliminated by a different policy regarding sales from his herd, lends color to his assertion that improving the herd and retaining the cattle in question for that purpose was his true intent.

Respondent's use of the so-called age test to determine which cattle were and were not held for breeding or dairy purposes (setting 24 months of age as the dividing line) was derived from the *Fox* case, *supra.* In *Estate of C. A. Smith, supra,* this Court made the following observations:

We adopted the age test in the *Fox* case because we had to make an approximation of which animals involved were part of the breeding herd. In that case, the taxpayers had relied exclusively on the fact that the registration of their purebred animals was enough to classify them as members of the breeding herd. We felt that more evidence of the purpose for which the animals were held was necessary. However, we were convinced that some of the animals involved were part of the breeding herd but, because of the state of the record in that case, we were unable to determine with respect to particular animals whether or not they were used for breeding. Therefore, we adopted the age test as a kind of rule of evidence to decide the case. On review, the Fourth Circuit held that our test was reasonable and fair in the circumstances of that case.

We then went on to say in the *Smith* case that respondent's proposed age test was erroneous in that it made immaturity conclusive, whereas the Fourth Circuit in the *Fox* case noted that, under the amended section 117 (j) (1), "The important thing is not the age of the animals but the purpose for which they are held," 198 F. 2d at p. 722.

The evidence in the instant case distinguishes it from *Fox* and makes it unnecessary to resort to the age test. Petitioner here does not solely rely on registration of his cattle to prove the purpose for which they were held. Rather, he has given us a picture of his complete method of operation, emphasizing the selective breeding practices followed. We are convinced, as was the Second Circuit in the previous *McDonald* case, that although an affirmative judgment cannot be made that an animal is of the quality desired prior to examination of its offspring, it is possible prior to that time to make a *negative* judgment (on the basis of objective physical characteristics) that an animal is *unsatisfactory*. It has been established to our satisfaction that the animals sold by petitioner were disposed of solely on the basis of such judgments as not being fit for breeding or milk producing, and that they were held for those purposes before disposal. Moreover, we note that in *Fox* the ages at which the animals were sold depended on the preferences and desires of purchasers, whereas here the age of sale was that age at which it became evident that the particular animal did not meet the established standards for breeding or milk producing.

We are aware that on facts somewhat similar to those in the instant case it was held, in *Gotfredson* v. *Commissioner*, (C. A. 6) 217 F. 2d 673, affirming a Memorandum Opinion of this Court, that taxpayer's cows (and heifers) under 36 months of age and bulls under 48 months of age, at time of sale, were not held for dairy purposes but were held for sale to customers in the ordinary course of trade or business, and that the gain on their sale was therefore taxable as ordinary income. It is noted, however, that the court was influenced by the fact that during the years in issue taxpayer advertised his stock for sale in various issues of three magazines and used stationery with a letterhead describing himself only as a breeder. In the instant case petitioner advertised only once a month in one magazine and never advertised any specific animals for sale; rather his ads mentioned no more than that occasionally some of his stock would be for sale. Petitioner also had a booklet of the herd's history printed in 1945 to show prospective purchasers visiting the farm. But the purpose of the booklet was to save the farm's key personnel from spending time in personally relating the herd's history to such prospective purchasers. This would seem to indicate that the sales function was minimized on petitioner's farm and his personnel were intended to devote as much time as possible to the breeding and dairy functions. At any rate, we think petitioner's magazine advertising and his booklet constituted no more than an advantageous method of liquidating his investment in the cattle sold and was not so extensive as to place him in the trade or business of selling such cattle.

Admittedly the question here is a difficult factual one to decide. The Sixth Circuit in *Gotfredson, supra,* took note of this indicating that if the question had arisen before it in a trial *de novo,* rather than on appeal from this Court, it might have reached the conclusion arrived at by the Second Circuit in *McDonald.*[6] After carefully considering the record before us, however, we have concluded that petitioner has carried his burden of proving that respondent erred in his determination. The cattle raised by petitioner and sold between the ages of 6 and 24 months were held for breeding or dairy purposes and the proceeds of those sales are entitled to capital gains treatment under section 117 (j).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[6] *Gotfredson* v. *Commissioner, supra,* at p. 677:

We recognize that the Court of Appeals for the Second Circuit in *McDonald* v. *Commissioner,* 214 Fed. 2d 341, has recently reached a different result from that reached in *Fox* v. *Commissioner, supra.* If this matter was before us in a trial *de novo* the reasons given for the ruling in that case would be persuasive. The two cases represent different conclusions from similar factual situations, both reasonably arrived at. But, eliminating the legal issues involved, hereinabove discussed, the basic question remaining is one of fact. * * * We are unable to say that the facts in this case do not support the Tax Court's finding that the heifers and bulls sold by the taxpayer before they were accepted into the herd were not held for dairy purposes, but instead were held for sale to customers, or that such finding is clearly erroneous. Unless clearly erroneous, the finding is binding upon us. * * *

MURDOCK, *J.*, concurring: The petitioner has sustained his burden of proof on the issues raised and the case should not be decided upon reasoning which was not the basis for the Commissioner's determination and was not timely injected into the case. However, the result might be different if the point had been made that the petitioner's business was essentially that of selling high-grade Guernseys for profit and his dairy business was subordinate. The fact that young animals were retained for substantial periods of time as a part of the herd might not be determinative of that issue. The largest returns were from sales. The dairy paid a much smaller part of the expenses, but it no doubt demonstrated the quality of the animals and made them more attractive to possible purchasers. It is obvious that the petitioner always intended to sell most of the animals retained, and it is conceivable that his purpose in retaining many of them was to sell them at prices based upon the distinction that they had been members of his outstanding herd.

TURNER, *J.*, dissenting: I concur in the views of Judge Rice as to the meaning and intent of the statute. In addition, it is my view that the facts as found in this case not only show that the animals in question were never "used for breeding purposes," but that they were "never held for breeding purposes," even though the identification of the individual animals and their segregation from other young animals which were held and used for breeding purposes did not actually occur until at or shortly before their sale.

TIETJENS, *J.*, dissenting: I dissent, reluctantly, because I consider this question essentially to be a question of fact and I hesitate to disagree with the trier of the facts. On the underlying facts, however, I could come to no other ultimate conclusion than that the cattle in question were held primarily for sale to customers in the ordinary course of business and that the profit from such sales is properly taxable as ordinary income and not as capital gain.

RAUM, *J.*, agrees with this dissent.

RICE, *J.*, dissenting: I dissent, among other reasons,[1] because the legislative history of section 324 of the Revenue Act of 1951,[2] which amended section 117 (j) of the Code, demonstrates conclusively that Congress never intended that livestock sales enjoy capital gains treatment to the virtually unlimited extent which the majority has permitted herein.

---

[1] See *James M. McDonald*, 17 T. C. 210 (1951).
[2] 65 Stat. 452.

The sole objective, which Congress sought by the amendment, was to insure that livestock used in a taxpayer's trade or business be accorded the same treatment as any other asset so used. The Senate Finance Committee Report on the 1951 Act [3] states:

Section 117 (j) of the code provides, in effect, that a net gain from sales of "property used in the trade or business" of a taxpayer and held for more than 6 months is to be treated as a capital gain. In the case of a loss, it is to be treated as an ordinary loss. However, section 117 (j) states that this treatment is not to apply to "property of a kind which would be properly includible in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." In the case of farmers there has been considerable confusion and dispute for several years as to whether all livestock held for draft, dairy, or breeding purposes is "property used in the trade or business," or whether in some cases the livestock should be deemed held "primarily for sale to customers in the ordinary course of his trade or business."

The "considerable confusion and dispute" of which the committee spoke arose because several decisions of this Court and the Courts of Appeals were not being followed by the respondent. In *Albright* v. *United States*, 173 F. 2d 339 (C. A. 8, 1949); *Fawn Lake Ranch Co.*, 12 T. C. 1139 (1949); and *United States* v. *Bennett*, 186 F. 2d 407 (C. A. 5, 1951), the Tax Court and the Courts of Appeals for the Fifth and Eighth Circuits held that gain on the sale of culls *which had been used* in a breeding herd resulted in capital gain rather than ordinary income.

When Congress enacted the Revenue Act of 1950,[4] it was fully aware of the *Albright* and *Fawn Lake* cases. An amendment was offered on the Senate floor [5] designed to clarify section 117 (j) of the Code to give effect to the holding in those cases and thus establish beyond question that cattle could also be assets used by a taxpayer in his trade or business as a breeder. The debate on that amendment by its proponent and other Senators makes very clear that it was not intended to extend capital gains treatment to all sales of livestock by breeders, but only to the culls which had been used in the breeding herd—the situation in the *Albright* and *Fawn Lake* cases. The Chairman of the Finance Committee agreed to take the proposed amendment to conference with the restriction that it was to apply only to cattle, and only to cattle from the mother or breeding herd and not to their offspring. The amendment, as modified, was adopted by the Senate, but was rejected in the conference with the House. The conference committee, nonetheless, expressed the hope that the Treasury would thereafter follow the *Albright* decision.

After the *Bennett* case was handed down by the Court of Appeals for the Fifth Circuit in 1951, following the rule of the *Albright* case,

---

[3] S. Rept. No. 781, 82d Cong., 1st Sess. (1951), p. 41.

[4] 64 Stat. 906.

[5] 96 Cong. Rec. 14082 (1950).

the Bureau of Internal Revenue issued a ruling, Mim. 6660, to the effect that capital gains treatment would be applied to sales of culls. Again quoting from the Report of the Senate Finance Committee, pages 41, 42:

However, this ruling contained a statement that this treatment might not be applied in the case of animals "not used for substantially their full period of usefulness." This exception appears to have resulted in new uncertainties, and it has been stated that Bureau agents are interpreting this ruling to mean that only animals which have completely outlived their usefulness can qualify for the capital gains treatment.

In view of the uncertainties resulting from the recent ruling (Mim. 6660), section 324 of your committee's bill restates the sentence contained in the House bill as follows:

Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or mor' from the date of acquisition.

Thus section 117 (j) will apply to livestock used for * * * breeding * * * purposes, * * * whether old or young; and the holding period will start with the date of acquisition, not with the date the animal * * * is put to such use.

Insofar as the statute is made applicable to all livestock, "regardless of age" and "held by him for 12 months or more from the date of acquisition," Congress obviously intended nothing more than to incorporate the holding of the aforementioned cases into the law and thus require the Commissioner to follow them.

The amendment raised doubts on the part of some Senators that it would permit capital gains treatment on all or most livestock sales. Those doubters were assured that no such broad extension of capital gains treatment was intended. In the course of the debate, the Chairman of the Finance Committee, in arguing for the defeat of a proposed amendment which would have eliminated section 324, made the following statement:[6]

Mr. GEORGE. Mr. President, the question, without this amendment, has been before the courts. Some courts have held one way on it, and the Treasury Department has seen fit to disregard the holdings of the courts, and, sometimes in the same judicial circuit, has continued to administer the law according to its own interpretation.

Generally the view has been that livestock used for breeding purposes and held for a longer period than a year does become a capital asset, and may be treated as such. The Treasury has disregarded that opinion. The House inserted the provision purely for the purpose of clarifying the particular section of the code applicable to the subject. It would be a most dangerous thing indeed to say now that the whole section should be impaired by an amendment which would deny to one capital asset the treatment which has been accorded capital assets heretofore, since the passage of the act.

I sincerely hope that the amendment will not be adopted. The committee approved the committee amendment and the House included its provision *solely* because the Treasury has not followed the rulings of the circuit courts in this matter. [Emphasis added.]

[6] 97 Cong. Rec. 12337 (1951).

But, by our holding herein, we have extended capital gains treatment to the very sales which those Senators, who opposed section 324 and the similar amendment proposed in 1950, feared would be accorded such treatment, but which the managers of the bill on the floor assured them would not happen.

By the enactment of section 324 in the 1951 Act, I am convinced that Congress did not intend to provide any special kind of treatment for cattle as distinguished from all other assets to which section 117 (j) had theretofore applied. The committee report refers to livestock *used* for breeding purposes. The statement of the Chairman of the Finance Committee contains the words "used for breeding purposes." The over-all purpose of the amendment was to make it clear to the Commissioner of Internal Revenue that section 117 (j) would, in fact, apply to all livestock *used* by a breeder in his trade or business, in conformity with the rule laid down by the cases heretofore cited. The animals in question here were not so used, and the majority opinion rewrites the statute to read "held for breeding purposes even though never used therefor." I would leave that prerogative to the Congress.

OPPER, LEMIRE, and RAUM, *JJ.*, agree with this dissent.