William H. Schudel and Zola Schudel v. Commissioner.
Schudel v. Commissioner
Docket Nos. 59747, 60498.
United States Tax Court
T.C. Memo 1957-54; 1957 Tax Ct. Memo LEXIS 192; 16 T.C.M. (CCH) 238; T.C.M. (RIA) 57054; March 29, 1957
*192 Held, registered cattle sold by petitioners from the herd they called their "breeding herd," to cattle breeders who called at their farm, and to purchasers at auction sales following displays of the cattle at exhibitions, were sales of cattle held by petitioners primarily for sale to customers in the ordinary course of their business and not sales of cattle held for breeding purposes within section 117(j)(1), I.R.C. of 1939, and section 1231(b)(3), I.R.C. of 1954. Edward L. Vogeltanz, Esq., Ord, Neb., for the petitioners. Richard C. McLaughlin, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion The Commissioner determined *193 deficiencies in income tax against William H. Schudel and Zola Schudel, as follows: Year
Docket No.
Deficiency
1951
59747
$3,876.68
1952
59747
798.40
1953
60498
3,423.06
1954
60498
2,360.60
The single issue in this consolidated proceeding is whether the registered bulls and heifers which were sold by the petitioners in each of the years 1951 through 1954 were held by the petitioners for sale to customers in the ordinary course of their business, or were held for breeding purposes. Some concessions have been made by both respondent and petitioners which can be taken into consideration by a Rule 50 computation. Findings of Fact Some of the facts have been stipulated and are found accordingly: The petitioners are married individuals residing in North Loup, Nebraska. Their joint income tax returns for the years involved were filed in Omaha, Nebraska, with the collector of internal revenue for the year 1951, and with the district director of internal revenue for the years 1952, 1953 and 1954. Petitioners were, at all times herein material, the owners and operators of a farm consisting of approximately 1,000 acres near North Loup, Nebraska. The *194 principal source of income from the farming operation was from the sale of registered Hereford cattle. In 1941, the petitioners began developing their herd of Hereford cattle. Petitioners continually worked toward improving the breed, following the best recognized practices of the trade. These practices included the registration by numbers and name of each animal for purposes of identification with a certain blood line. Much care was given to controlling blood lines within the breed to improve the breed as a whole. Although the Hereford breed is a "beef" or "meat" breed, petitioners concentrated their efforts toward raising cattle for the purposes of breeding. Petitioners' herd developed through the years and by 1951 they had an established breeding herd consisting of two bulls and 43 dams. Only two bulls were needed to service the petitioners' main herd dams in 1951. In 1952, 1953 and 1954, when the main herd dams increased from 43 to 55, three main herd bulls were needed. The 85 bulls and 15 heifers involved herein were the offspring of that herd. The cattle owned by petitioners were physically separated when they were calves into two herds, referred to by petitioners as the *195 "breeding herd" and the "ordinary herd." Calves deemed not fit for breeding purposes were culled out, placed in the "ordinary herd," and eventually were sold as beef cattle. Animals deemed good enough for breeding purposes were placed in the "breeding herd" and given special attention. Our only concern is with the so-called "breeding herd." The breeding herd was broken down into separate pastures and lots according to blood lines, sex, and age in accordance with good practices of breeders. Included in this number were main herd dams and bulls. The main herd dams and bulls are the animals which were bred for the purposes of increasing the herd. From 1951 through 1954, the main herd bulls increased by only one, and the main herd dams increased over the same period by 12. All animals, except for these 13, born to the main herd cows and bulls, were either culled and sold for "beef" or were sold to other breeders as breeding cattle. The latter group of 85 bulls and 15 heifers sold as breeders are the animals in issue. Petitioners regularly show and sell cattle at various cattle shows. Much attention and work is devoted to preparing the individual animals to be shown. Special care begins *196 approximately two months before show time and includes a special diet, weekly baths, and daily brushings. At most of these shows, the cattle shown must be sold at auction after being exhibited. At all of the exhibits, petitioners' show cattle were sold at auction. While most of petitioners' animals were sold in this way, some were sold at petitioners' farm to people who came to the farm to look at the cattle. Of the 15 heifers sold by petitioners over the years involved, none had reached the breeding age. Of the 85 bulls sold, 20 had been "tried" with "ordinary" cows. A "tried bull" is one that has been bred to a cow to produce a calf. Since the petitioners were selling breeders, the fertility of the bulls was guaranteed. The only reason petitioners "tried" their better bulls was to protect themselves under the guaranty. None of the main herd bulls was sold during the years involved herein. During each of the years 1951 through 1954, the petitioners advertised their cattle in at least one of several publications. The purpose of this advertising was to let breeders know that petitioners had registered Hereford cattle for sale. The petitioners reported their income on a cash basis. *197 For the four years herein involved the petitioners had long-term capital gains from the sale of registered Herefords, as follows: Reported
Bulls
Heifers
Long-Term
Year
Sold
Sold
Capital Gain
1951
17
0
$23,892.55
1952
10
10
15,293.52
1953
31
1
26,515.98
1954
27
4
28,849.75
Totals
85
15
$94,551.80
The respondent determined that 85 bulls and 15 heifers sold by the petitioners from 1951 through 1954 were held by them for the purpose of sale and the gain derived therefrom should have been reported as ordinary income. The registered Herefords involved herein, with the exception of Pioneer 37th, Domino 66th, and Pioneer 18th, were held by the petitioners for sale to customers in the ordinary course of business. The three bulls just named were held by the petitioners for breeding purposes. Opinion MULRONEY, Judge: The sole issue in this consolidated proceeding is whether the petitioners are entitled to treat the registered Hereford cattle sold by them in the years in issue as animals used in their trade or business, or whether such cattle were animals held by petitioners primarily for sale to customers in the ordinary course *198 of their business. If such cattle were held by petitioners for breeding purposes, then, under the provisions of section 117(j)(1) of the Internal Revenue Code of 1939, [1] and section 1231(b)(3) of the Internal Revenue Code of 1954, [2] the petitioners are entitled to treat the profits derived from such sales as gain from the sale of capital assets. If, on the other hand, such cattle were held primarily for sale to customers in the ordinary course of business, the profit derived from such sales would be ordinary income. *199 The determination of which animals, if any, were held by the petitioners for breeding purposes is essentially a question of fact. Estate of C. A. Smith, 23 T.C. 690. It is so obvious that petitioners were in the business of selling purebred breeding cattle to breeders that no detailed review of the evidence is necessary. As we read petitioners' argument, they seem to base their case on three points: (1) the sales were all made from the breeding herd, (2) the animals in question were all held by them with the bona fide purpose and intent to use them as breeding cattle, and (3) the animals were sold under special circumstances. The animals sold were all from the herd designated by the petitioners as the "breeding herd." But that fact does not, of itself, indicate the purpose for which they were being held. It is perfectly apparent from all of the evidence that the term "breeding herd" was used by petitioners to describe and include all animals which satisfied petitioners' standard of a breeding animal. The second point, that the animals were all held by them with the bona fide purpose and intent to use them as breeding cattle, is not supported by any evidence. The *200 argument advanced by petitioners is summed up in this sentence from their brief: "The animals here involved were sold from the breeding herd, and they should be treated as property used in the trade or business as capital assets." The record shows, very convincingly, that petitioners' primary source of income during the years at issue was from the sale of registered cattle. On their income tax returns for the years 1951 to 1954, inclusive, petitioners reported the following amounts from the sale of cattle as ordinary income and capital gains: Year
Ordinary Income
Capital Gains
1951
$ 204.37
$ 28,992.55 *
1952
3,103.34
16,233.77
1953
2,749.60
26,876.05
1954
2,087.37
28,849.75
Total
$8,144.68
$100,952.12
Petitioners advertised they were holding registered cattle for sale to breeders in certain periodicals, such as the American Hereford Journal, the Daily Journal Stockland, and publications of the Nebraska Stock Growers Association, and the Western Livestock Association. Petitioner Schudel testified that in all of the years in question he *201 advertised in at least one of these publications. He said the purpose of the advertising was to let breeders know that he had breeding cattle. When asked if the purpose of the advertising was to let breeders know that he had those cattle for sale, he hedged a bit, but answered: "They were up for sale at a price, yes." It is abundantly clear that petitioners held the breeding herd for sale. The argument under the third point that the animals were sold under special circumstances is an argument that the sales were not made "in the ordinary course of his trade or business." Petitioner points to the sales as being made to persons who just happened to drop around to his farm or at exhibitions, citing Estate of C. A. Smith, supra. In the cited case it was held 171 out of 800 registered bulls sold, at auctions and exhibitions, were held for breeding purposes and not held "primarily for sale to other breeders." The sales at the farm were obviously in response, in part at least, to the advertising program. For all that appears in this record, the ordinary course of sale for one in the business of selling registered cattle for breeding purposes is the exhibition method. Petitioner *202 admits that most of the displays where his registered cattle were competing for awards and honors were conditioned on the requirement or at least the understanding that petitioners would allow the animals that were exhibited to be sold at the auctions that followed the exhibition. So far as petitioners were concerned, all of their show cattle were sold at the auctions that followed the exhibitions. On the record presented, we are convinced all of the cattle, with three exceptions noted later, were sold in the ordinary course of petitioners' business, which, we hold was that of selling registered cattle to breeders. Petitioners make some mention in their brief that the animals sold "were of a quality ordinarily retained * * * to replenish their breeding stock." Petitioners do not make the argument that all of the animals were intended to be so used and there is no evidence that would indicate a plan for a fast, expanding herd such as found in James M. McDonald, 23 T.C. 1091. The practice of the petitioners was to keep two or three bulls to service 43 to 55 dams. Based on this practice, it is obvious that the petitioners could not have intended to use the 85 bulls sold *203 to serve the dams which the petitioners had. Based also on the ratio of one bull to 17 dams, petitioners would have needed approximately 1,450 cows to have retained the 85 bulls for breeding purposes. In 1951, the petitioners had a main herd consisting of two main herd bulls or sires and 43 cows or main herd dams. One bull was added to this herd in 1952 and the number of main herd cows increased to 55 by 1954. This was the herd used to produce petitioners' calf crop and the animals in controversy. None of the bulls and heifers sold was a part of this main herd and none sold had actually been used for breeding purposes by the petitioners. A few of the bulls sold were "tried" with ordinary cows but only for the purpose of verifying fertility. We realize that the fact that the bulls and heifers sold had not been used for breeding is not fatal to petitioners' position if they were in fact held for the purpose of being put to that use. James M. McDonald, supra. William H. Schudel's own testimony throws more light on the real intentions of the petitioners as to the purposes for which the cattle were held. In going through the long list of cattle sold by name and purchaser, *204 Schudel mentioned three bulls with special emphasis. Referring to W. S. Domino 66th, he stated that he "was a bull we had retained for our own breeding herd. They fell in love with him, I didn't have any price on him; finally they asked me to price him, I did it, and sold him. I've regretted it ever since." Referring to W. S. Pioneer 18th, he stated: "* * * he was another one we had reserved for our own use." Referring to W. S. Pioneer 37th, he stated that he was "one of the young bulls we had retained for our own breeding herd to use in our own herd, * * *." The special emphasis placed on these three bulls indicates strongly to us that these bulls were the only ones selected and retained by the petitioners, as Schudel put it, "for our own breeding herd." We hold that the petitioners intended to use these three bulls as replacement bulls for their main herd and are entitled to capital gains treatment on the sale thereof. We hold petitioners were holding the registered cattle in issue, with the three exceptions mentioned, primarily for sale to customers in the ordinary course of their business. Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * * Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. * * * ↩
2. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. * * *
(b) Definition of Property Used in the Trade or Business. - For purposes of this section - * * *
(3) Livestock. - Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. * * *↩
*. Includes $5,100.00 realized from sale of fourteen heifers and reported as a short-term capital gain.↩