George W. DeHaven, Jr., and Christine S. DeHaven v. Commissioner.
De Haven v. Commissioner
Docket No. 73354.
United States Tax Court
T.C. Memo 1960-114; 1960 Tax Ct. Memo LEXIS 179; 19 T.C.M. (CCH) 606; T.C.M. (RIA) 60114; May 31, 1960
John A. Ross, Esq., 501 East 27th Street, Kansas City, Mo., for the petitioners. Drew R. Tillotson, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of the petitioners as follows: Year
Deficiency
1951
$ 7,916.94
1952
12,858.84
1953
7,776.06
All of the issues presented by the pleadings have been disposed of by agreements of the parties except (1) whether a portion of the cattle sold during each of the years 1951, 1952, and 1953 constituted capital assets and (2) the correctness of respondent's allocation of the sales price received by petitioner for cattle sold on December 7, 1953. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners *180 George W. DeHaven, Jr., and Christine S. DeHaven, husband and wife, were residents of Kansas City, Missouri, during the taxable years 1951, 1952, and 1953 and timely filed their joint Federal income tax returns for the respective taxable years with the district director in Kansas City, Missouri. Sometimes hereinafter the term petitioner will be used to refer to petitioner George W. DeHaven, Jr. Prior to 1946 the petitioner owned a few head of registered Black Angus cattle. About 1946 he purchased something in excess of 100 acres of land situated about 10 miles from Kansas City, Missouri. In 1947 or 1948, he purchased additional adjacent acreage to bring the total to approximately 470 acres, which comprised what was known as Green Valley Farms. The petitioner used approximately one-half of the total acreage for pasture purposes and the remainder for growing hay and other feed crops. About 1946 or 1947, the petitioner began to build a breeding herd of registered Black Angus cattle by making purchases at different auction sales of less costly cattle. No definite number was decided upon as the size of the herd he would build. However, he wished to have a herd of sufficient size to *181 handle his available pasturage. By 1950 the petitioner had a herd of approximately 100 head of cattle, about 50 of which he had purchased. The remainder represented offspring of the cattle he had purchased. Although between 1946 and 1950 the herd had increased in numbers, the petitioner had found, through testing the herd by occasional sales of heifers therefrom, that the grade of his herd was such that there was not a market for his cattle at the prices which he desired and which were necessary if a loss on his breeding operations was to be avoided. As a consequence, the petitioner, on or about January 1, 1950, formulated what he termed a "ten-year plan" and decided to conduct his cattle business thenceforth in accordance with that plan. The plan provided that petitioner would begin in 1950 to build a breeding herd of registered Black Angus cattle of superior quality and value, sometimes hereinafter referred to as the superior herd, and of a sufficient number so that by 1960 he could begin selling cattle from that herd in competition with other breeders of registered Black Angus cattle of superior quality and value. With respect to the petitioner's herd at the beginning of 1950, sometimes *182 hereinafter referred to as the inferior herd, the ten-year plan provided that petitioner would sell it and the calves which it might produce before the entire herd was sold. The petitioner's reasons for this provision of the plan were that in building the superior herd the inferior herd was no longer desirable and that by its sale the petitioner would avoid the reputation of having inferior cattle, would acquire some of the funds required to purchase cattle for the superior herd and would be enabled to provide on the Green Valley Farms pasturage and other accommodations for the superior herd. Pursuant to the ten-year plan and as the first animal for the superior herd, the petitioner in 1950 purchased for $10,000 a bull known as Prince 27th of Essar. Thereafter and during 1951, 1952, and 1953, the petitioner purchased for the superior herd one or more bulls and some cows. In addition he purchased 50 heifers in 1951, 19 in 1952, and 5 in 1953. Although the petitioner had decided to sell the inferior herd, he continued to breed cows in that herd for the purpose of preventing them from becoming nonbreeders and incidentially with a view of selling their calves as culls. While the *183 record does not show the number of cattle sold from the inferior herd during 1950, it shows that in the August 1950 issue of the Angus Journal, a monthly trade paper for the Black Angus industry, the petitioner advertised that he would consign an undisclosed number of heifers of four named cows and heifers of other unnamed cows to the Missouri State Fair, Heart of America Sale, Southwest Regional Sale, and the Omaha National Sale. Although the petitioner previously had made sales of some heifers by consignment to various fairs and sales, where the cattle were sold at auction, it was not until November 3, 1951, that any of his cattle were sold at an auction sale conducted at Green Valley Farms. For several months prior thereto the petitioner advertised the sale in the Angus Journal. The petitioner also published a catalogue describing the animals, with their pedigrees for 3 generations, which were to be sold at the November 3, 1951, sale. Although many of the cattle from the inferior herd were sold at this sale, not all that the petitioner had expected to sell were sold due to snow and sleet accompanied by a high wind which blew down the auction tent and terminated the sale prior *184 to completion of the auction. Some of the petitioner's superior cattle which he had purchased were sold at the sale. They were offered in order to attract purchasers to the sale and in an effort to obtain better prices for the cattle from the inferior herd. On September 23, 1952, the petitioner had another auction sale of cattle which was conducted at the Green Valley Farms. The petitioner advertised the sale in the Angus Journal for serveral months prior to the time it was held. The petitioner also published a catalogue describing the animals, with their pedigrees for 3 generations, which were to be offered for sale. Most of the cattle remaining from the inferior herd were sold at this sale. The proceeds from this sale and from the sale of November 3, 1951, were used by petitioner to purchase cattle for the superior herd. During 1953 a drought occurred in the area of the Green Valley Farms. This made it necessary for petitioner to incur considerable additional expense for feed for his cattle. Because of this and as a result of reverses in other of his business activities, the petitioner became financially unable to continue his cattle breeding business. Accordingly, on December 7, 1953, the *185 petitioner sold all of his remaining registered Angus cattle to E. W. Thompson and retired from the cattle breeding business. The selling price was $98,610.02 of which the sum of $92,000 was received by petitioner during 1953 and the remainder, $6,610.02, was received by him during 1954. The sale to Thompson was made under an arrangement whereby he, Thompson, would resell the cattle at an auction sale held on his farm but conducted in the name of the petitioner and which the petitioner would attend and render any possible assistance. The auction sale by Thompson was held on February 6, 1954. That sale was advertised in the Angus Journal and a catalogue of the animals, with their pedigrees for 3 generations, also was published. In building his inferior herd as well as in building the superior herd, the petitioner disposed of the bull calves found at birth to be undesirable for breeding purposes while they were quite young. Some were killed. Others were sold at prices of from $15 to $20 to ranchers and to stockyards for canner or cutter use. Prior to the adoption of the ten-year plan none of the heifers born of the herd were considered undesirable. However, after the adoption of that *186 plan all heifers in and subsequently born of the inferior herd were considered undesirable. The petitioner attempted to sell those animals in the auction sale of November 3, 1951. Heifer calves born of the superior herd and found at birth to be undesirable were sold at consignment sales to which other breeders also consigned their undesirable animals for sale. Cattle born of the superior herd, and not found at birth to be undesirable for breeding purposes, were held as part of the superior herd and continued to be so held until their development became such that they were no longer desirable for breeding purposes and for retention in the herd. Subsequently such cattle were sold. Cattle raised by the petitioner and at issue herein were sold by petitioner during 1951, 1952, and January 1 to December 7, 1953, as follows: 1951
Whether animal had been bred or had
been used for servicing between date
No.
Sex
Age
of acquisition and date of sale
1
Female
46 mos.
Bred
7
Females
25-31 mos.
Bred
14
Females
12-22 mos.
4 Bred - 10 Not Bred
3
Males
18-19 mos.
Used for servicing
4
Males
13-22 mos.
Used for servicing
Total 29
1952
1
Female
34 mos.
Bred
25
Females
12-20 mos.
6 Bred - 18 Not Bred - 1 Unknown
Total 26
January 1 to December 7, 1953
3
Females
19-25 mos.
Not shown
8
Females
12-15 mos.
Not shown
3
Males
Born in 1951 and 1952
Not shown
and sold 4/15/53
Total 14
*187 Of the 29 animals sold in 1951, 25 were sold at the auction conducted at Green Valley Farms on November 3, 1951. All 26 of the animals sold during 1952 were sold at the auction at Green Valley Farms on September 23, 1952. Cattle at issue herein and raised by petitioner, except as otherwise shown, and sold to Thompson on December 7, 1953, were as follows: Whether animal had
been bred or had been used
for servicing between date of
No.
Sex
Date acquired
acquisition and date of sale
1
[1] Female 3/12/53
Bred
1 Sire
[1] Male 4/20/53
Used for servicing
3
Males
3/52-6/52
Unknown
2 Calves
Males
Unknown
Not used for servicing
29 Calves sold at sides
Males
27 born in 1953 - 2 unknown
Not used for servicing
of their mothers
23 Calves sold at sides
Females
22 born in 1953 - 1 unknown
Not bred
of their mothers
1
Female
Jan. 1951
Bred
1
Female
Nov. 1951
Not bred
3
Females
Mar. 1952
1 Bred - 2 Not Bred
1
Female
Apr. 1952
Not bred
7
Females
May 1952
Not bred
4
Females
Nov. 1952
Not bred
1
Female
12/10/52
Not bred
1
Female
12/15/52
Not bred
1
Female
12/16/52
Not bred
1
Female
12/23/52
Not bred
26
Females
1/53-7/53
Not bred
106 Total
*188 The calves sold at the sides of their mothers on December 7, 1953, had a fair market value of $25 each on the date sold. From and after January 1, 1950, all cattle which were in the petitioner's inferior herd were held by petitioner primarily for sale to customers in the ordinary course of his business. All of the cattle in controversy here which were born of the petitioner's inferior herd subsequent to January 1, 1950, also were held by petitioner primarily for sale to customers in the ordinary course of his business. All of the cattle in controversy here which were born of the petitioner's superior herd and were held by the petitioner for 12 months or more from the date of birth and were sold between January 1 and December 7, 1953, were held by petitioner for breeding purposes. All of the cattle in controversy here which were born of the petitioner's superior herd and were held by the petitioner for 12 months or more from the date of birth and were sold on December 7, 1953, were held by petitioner for breeding purposes. Opinion The first issue for consideration involves the cattle set out in our findings of fact as having been sold by petitioner *189 during 1951, 1952, and 1953, all of which were raised by petitioner, except two head which were purchased in 1953 and sold during that year. The cattle here involved comprised only a portion of the cattle sold by the petitioner during the years 1951 through 1953. The parties are in agreement respecting the purposes for which the cattle not involved here were held and the treatment to be accorded the gains or losses resulting from their sale. The petitioners contend that all cattle sold by petitioner as set out in our findings of fact constituted capital assets within the meaning of section 117 of the Internal Revenue Code of 1939, pertinent portions of which are set out below, [1] and that gain on the sale thereof is to be treated as gain from the sale of capital assets. The respondent takes the position that the cattle in issue constituted cattle held by petitioner primarily for sale to customers in the ordinary course of his trade or business and were not capital assets. *190 The term "capital assets" as defined in section 117 includes "livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition." However, the term does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The question of whether livestock is held for draft, breeding, or dairy purposes or is held primarily for sale to customers in the ordinary course of trade or business is one of fact to be determined from a consideration of all the evidence bearing on the question. Gotfredson v. Commissioner, 217 F. 2d 673, affirming a Memorandum Opinion of this Court dated August 31, 1953 [12 TCM 1007], certiorari denied 350 U.S. 846; Fox v. Commissioner, 198 F. 2d 719, affirming 16 T.C. 854; Estate of C. A. Smith, 23 T.C. 690; James M. McDonald, 23 T.C. 1091. As was pointed out in Fox v. Commissioner, supra, and James M. McDonald, supra, the important thing in a determination of the question is the taxpayer's motive *191 or purpose in holding the cattle. Based on the testimony of the petitioner as to his adoption of the ten-year plan on or about January 1, 1950, and his intention thenceforth to dispose of the herd he had at that time, the inferior herd, as well as the evidence showing that he put such intention into effect, we have concluded and found as a fact that all cattle in controversy here which were in the petitioner's herd on January 1, 1950, and all cattle in controversy here which thereafter were born of that herd were held by the petitioner primarily for sale to customers in the ordinary course of his business. Although some of the cows in the inferior herd were bred after January 1, 1950, the petitioner's testimony shows that this was done for the purpose of preventing them from becoming nonbreeders or, in other words, to preserve the capacity of such animals to command higher selling prices than if they were sold as nonbreeders. The petitioner's testimony also shows that the calves produced from such breeding were produced for and were held for sale and not for breeding purposes. Beginning in 1950 and continuing until the sale to Thompson on December 7, 1953, the petitioner was engaged *192 in building the superior herd. Cattle born of this herd, and not found at birth to be undesirable for breeding purposes, were held as part of the superior herd and continued to be so held until their development became such that they were no longer desirable for breeding purposes and for retention in the herd. Thereafter such cattle were sold. Finally on December 7, 1953, the petitioner sold his entire herd and retired from the cattle business. In our opinion the following statement made in James M. McDonald, supra, is applicable here: "It is not necessary that an animal reach maturity and produce a calf for it to fall within the wording of that section [117(j)(1)]. The animal need not have been actually put to the prescribed use if it was in fact held for the purpose of being put to that use. * * * Actual use, of course, is an evidentiary factor to be taken into account in determining the factual question of the purpose for which the animal was held, but it is not the sole determinative. Moreover, we agree with the Court of Appeals in the prior case [McDonald v. Commissioner, 214 F.2d 341, reversing 17 T.C. 210] that it cannot be said *193 that the raised calves were held primarily for sale merely because it could be predicted that some would be sold each year. * * *" Accordingly, we have found as a fact that all of the cattle here in controversy which were born of the petitioner's superior herd and were held by the petitioner for 12 months or more from the date of birth were held by petitioner for breeding purposes. Consequently, all such cattle constituted capital assets within the meaning of section 117(j)(1) of the Code. The minimum period for which cattle must be held by a taxpayer for breeding purposes in order for them to qualify as capital assets was 12 months from date of their acquisition by the taxpayer. Cattle which were not held by the taxpayer for such minimum period at the time of their sale by him do not qualify as capital assets even though they were held for breeding purposes. Furthermore, cattle the acquisition date of which is unknown do not qualify for classification as capital assets for the reason that it has not been shown that they were held by the taxpayer for the required minimum holding period. The remaining issue involves the question of the correctness of the respondent's allocation *194 of the sales price received by petitioner for cattle sold on December 7, 1953. The only evidence submitted by petitioner which was directed to this question was as to the fair market value of the calves sold at the sides of their mothers on December 7, 1953. From the evidence submitted we have found that the fair market value of such calves on the date in question was $25 each. Since we are without evidence as to the correctness of any other allocations involved, the respondent's determination as to them must stand. Decision will be entered under Rule 50. Footnotes
1. Acquired by purchase.↩
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a)(1)(C). Such term also includes timber or coal with respect to which subsection (k)(1) or (2) is applicable and unharvested crops to which paragraph (3) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.↩