FOX et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 6417.

United States Court of Appeals Fourth Circuit.

Argued June 20, 1952.

Decided July 31, 1952.

George Craven, Philadelphia, Pa., for petitioners.

Maryhelen Wigle, Sp. Asst. to Atty. Gen. (Ellis N. Slack, Acting Asst. Atty. Gen. and L. W. Post, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and PAUL, District Judge.

PAUL, District Judge.

The petitioners in this case, Walter S. Fox and Eleanor C. Fox, seek review of a decision of the Tax Court of the United States which determined deficiencies in income taxes against them for the years 1944, 1945 and 1946 in the following amounts:

|  | Walter S. Fox | Eleanor C. Fox |
|---|---|---|
| 1944 | $1,381.86 | $1,521.61 |
| 1945 | 4,555.80 | 4,584.79 |
| 1946 | 3,683.49 | 3,573.42 |
|  | $9,621.15 | $9,679.82 |

The petitioners filed separate Federal income tax returns for the years in question and the deficiencies were separately adjudicated, but since the matters in controversy are the same in both cases they have been consolidated for hearing in this court.

The petitioners, who are husband and wife, are the joint owners and operators of a farm of 700 acres in Loudon County, Virginia, on which they have been engaged in the business of raising cattle and sheep, together with feed for this livestock. The farm was operated and income tax returns were made on a cash basis and the livestock was not inventoried. The primary business of the farm was the raising of Aberdeen Angus cattle and the controversy here involves the proceeds from the sale of such cattle.

Petitioners began their cattle breeding business in 1939 with the purpose of building up a herd of pure-bred Aberdeen Angus of a distinctive type, and with the expectation, so they state, that a substantial capital gain would be realized from the eventual sale of such a herd. Beginning in 1939 with 10 heifers and a bull which they had purchased the petitioners gradually built up their herd until in the years 1942 through 1946 they owned the following numbers of what they term "mature

cattle", these constituting the producing herd and made up of bulls that had been used as herd sires and cows that had produced calves.

| Year | Cows | Bulls |
|------|------|-------|
| 1942 | 57 | 2 |
| 1943 | 46 | 2 |
| 1944 | 34 | 2 |
| 1945 | 52 | 2 |
| 1946 | 80 | 4 |

There is no evidence to show how many of the animals in this producing group had been purchased by petitioners or how many had been raised by them.

While the Aberdeen Angus is a beef animal the petitioners were primarily engaged in raising cattle for sale to other breeders and not for slaughter purposes. The course of their operations appears to have been similar to those of other persons engaged in the same sort of activities. In the breeding of cattle all calves produced are not of uniform quality and petitioners followed the practice of registering only those animals which, in their opinion, gave promise of being high-grade breeding stock. Those animals considered of inferior quality and without value for breeding purposes were not registered and were sold off for slaughter purposes, either as calves or steers. The proceeds of the sale of these culls or unregistered animals are not in dispute here.

Calves which were considered as showing the qualifications for potential breeding stock were registered with the Aberdeen Angus Association—usually before they were six months old—and were held for such varying periods of time as were determined by the opportunity for an advantageous sale. At the end of the years 1942 through 1946 the petitioners owned the following numbers of registered cattle.

| Year | Total No. of Animals |
|------|----------------------|
| 1942 | 142 |
| 1943 | 144 |
| 1944 | 146 |
| 1945 | 167 |
| 1946 | 203 |

The above figures included not only the producing herd, but also younger animals of varying ages, some of which were not yet of breeding age and others of which had been bred but had not yet produced calves.

The petitioners appear to have conducted their operations in accordance with the regulations of the American Aberdeen Angus Association under which it was permissible to breed heifers at 15 months of age and bulls at 13 months. And, except for those sold at an earlier age, most of the animals raised by petitioners were bred within a comparatively short time after reaching these respective ages. The period of gestation in cows is approximately nine months and it is not until the lapse of this further time that it can be definitely determined that the animals will reproduce. However, because a calf could not be registered unless born from a cow which was at least twenty-four months old, the petitioners so planned it that none of the females in their possession dropped a calf before reaching the age of twenty-four months.

During the year 1944 the petitioners sold 43 head of their registered stock; in 1945 they sold 39 head; and in 1946 they sold 36 head. When sold these animals varied in age from five or six months to three years or more. The bulk of them were between the ages of 10 and 24 months. The differing ages at which the animals were sold was due to the differing preferences or desires of purchasers. Some persons were willing to buy calves to be raised for future breeding purposes. Others who desired to breed the animals immediately purchased animals which had attained breeding age and which had either been bred or were ready to breed. Still others purchased older animals which, having actually produced calves, were considered proven breeders.

It is the proceeds from the sale of the 118 head of registered stock sold in the years 1944, 1945 and 1946 which is in issue. The question is whether the gain realized on the sale of these cattle is taxable as a capital gain, as petitioners contend; or as ordinary income, as the Tax Court held.

The pertinent statute is Sect. 117 of the Internal Revenue Code, 26 U.S.C.A. § 117,

dealing with "capital gains and losses". Sect. 117(a) (1) in defining "capital assets" excludes therefrom property held by the taxpayers primarily for sale in the ordinary course of his trade or business. Sect. 117(j) provides for the taxing as long-term capital gains of the net gains on sales of "property used in the trade or business" and in defining the term "property used in the trade or business" specifically provides that, among other things, it *does not include* property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the end of the taxable year, or property held primarily for sale in the ordinary course of the taxpayer's trade or business.

In 1951, Act of Oct. 20, 1951, Sect. 117(j) (1) was amended to indicate more clearly the inclusion of certain kinds of property within the definition of "property used in the trade or business". Among other things the amendment provided that "Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition." This amendment was made applicable to taxable years beginning after December 31, 1941, except that the extension of the holding period from 6 to 12 months was applicable only to years beginning after December 31, 1950.

It is the contention of petitioners that whenever, and as soon as, any animal raised by them was registered it thereby became a part of their breeding herd and that any sum realized thereafter from its sale was to be taxed as a capital gain. This argument is apparently based on the theory that some of the animals raised might ultimately be found worthy of retention as sires or dams in petitioners permanent herd and, therefore, all of them were to be treated as part of a herd held for breeding purposes.

The Tax Court denied this contention, with the comment that the most that could be said was that the animals when registered became potential members of a breeding herd. It pointed out that the mere act of registration did not establish an animal as a member of the breeding herd, for the reason that registration was equally necessary in order to make a sale to purchasers seeking registered stock for their own herds. The court further noted that the fact that some of the animals reached breeding age and were bred while still in the taxpayers' possession did not establish them as members of the breeding herd; that the custom of petitioners in selling heifers with calf and bulls as guaranteed breeders necessitated that they be bred by petitioners before sale. The conclusion of the Tax Court is embodied in the following excerpts from its opinion:

"We are left with the problem of determining which of the animals were eventually included in the breeding herd. The problem is rendered difficult by petitioners' failure to submit a detailed history of the animals on the basis of which we could make an accurate determination. The only criterion relied on by the petitioners is the fact of registration."

"After a careful consideration of the entire record, we have concluded that the heifers raised, registered, and sold by petitioners before they dropped a calf should not be regarded as a part of the breeding herd, and those animals that dropped a calf while still owned by petitioners should be regarded as a part of that herd. Since we are unable to determine from the evidence the exact number of calves in each category, an approximation is necessary."

"Inasmuch as the earliest age at which any of the heifers dropped a calf was 24 months and the latest was approximately 27 or 28 months, we adopt as average 26 months and for purposes of disposition of this case treat all females raised, registered, and sold by petitioners when 26 months old or over as having been a part of the breeding herd. The gain on their sale is taxable at capital gains rates. * * * The remainder were not part of the breeding herd but were instead held primarily for sale to customers. The gain on their sale is taxable as ordinary income."

\* \* \* \* \* \*

"It also appears that until a bull reached an age of from 32 to 37

months, it could not be satisfactorily determined that it possessed the necessary breeding qualities for such a herd as petitioners were raising. From the record made before us, we have determined that of the registered bulls raised and sold by petitioners, only those 34 months or older should be classified as part of the breeding herd and those under that age should be classified as property held by petitioners primarily for sale to customers."

We are of opinion that these conclusions of the Tax Court should not be disturbed. The opinion of that court was handed down prior to the enactment of the 1951 amendment to Sect. 117(j) (1) heretofore referred to but it does not appear that the amendment affects in any way either the reasoning or the conclusions reached by the court.

The taxpayers do not agree with this and now urge that the amendment of 1951 renders the holding of the tax court untenable and makes clear that the gains here in issue are taxable gains. In this argument the petitioners stress the fact that the amendment refers to livestock, *regardless of age*; and from this they argue that a breeding herd may be made up of animals none of which have as yet been bred or which may even be too young for breeding. This argument ignores the real point of the matter. The important thing is not the age of the animals but the purpose for which they are held.

The weakness of petitioners' contention is disclosed by their own testimony, as well as by certain obvious facts. In the normal course of events the calves born in any herd may be expected to be evenly divided as between males and females. If these petitioners had held all of their calves to become part of their breeding herd then by the laws of arithmetical progression the herd would soon have increased beyond the capacity of the farm and every cow would have had her individual bull. The testimony is, as a matter of fact, that four was the greatest number of herd bulls that petitioners ever had at one time, and these to serve 80 cows. As Mr. Fox, one of the

petitioners, testified: "Obviously we cannot keep all those animals which are male. It is just in the hope that we will get a successor bull that we will keep them all. We have to sell the excess."

Again Mr. Fox testified that on the average not more than one out of every one hundred bull calves raised by petitioners possessed breeding qualities sufficiently high as to meet the standards of petitioners' herd, and that in ten years they had raised only about 15 bulls of that quality. However, he gives no testimony as to how many of even this limited number were ever retained as herd sires, or, indeed, whether any of them were. The evidence does show, however, that during the three years for which taxes are in question the petitioners sold 44 male animals to other breeders.

Further testimony on behalf of petitioners was to the effect that after a bull had been bred and a calf produced as a result thereof, the calf must be 10 or 12 months old before it can be determined by observing the qualities of the calf, whether the sire possesses proper breeding qualities. As stated by Mr. Fox: "It takes a minimum of three years to know whether or not you have a good breeding bull". It was further testified that not until they had reached the age of at least 24 months were females allowed to give birth to calves.

Yet the evidence shows that of the 44 male animals sold by petitioners in the years 1944, 1945 and 1946 only one of them was as old as three years and all but two of them were less than two years old. The proportion of young animals among the heifers sold was somewhat less, but even there it appears that 75 per cent of the females were less than 24 months of age when sold. In other words, all but one of the bulls and three-fourths of the heifers were sold before they reached the age where it could be determined whether they were satisfactory breeding stock. This fact strongly denies the present contention of the petitioners that all the animals were held for breeding purposes and that any sales were merely incidental to the main business of building up the breeding herd.

It is true, of course, that a person may maintain a herd of cattle which represents "property used in the trade or business". It may be a dairy herd used in the business of producing milk or it may be a herd used in the business of producing calves. And when any members of these producing groups are sold there is a sale of a capital asset, and any animals replacing those sold and becoming part of the producing group become "property used in the trade or business". See Albright v. U. S., 8 Cir., 173 F.2d 339. But the milk and the calves are not property used in trade or business; they are the produce of such property. And the fact that the taxpayer may hold the calves for varying or indefinite periods does not make them "property used in the trade or business" unless they are actually held for inclusion in the producing herd.

This case turns on the facts and the facts are not complicated. The petitioners are engaged in raising high-grade Aberdeen Angus cattle and maintain a producing unit, the produce of which in the shape of offspring, both male and female, they customarily sell to other persons. Like all other persons engaged in a similar business petitioners are, no doubt, alert to maintain and to improve the high quality of their producing unit; and to this end it may be that at times they select from among the calves raised some animals which they consider of such high quality as to justify their being placed in the producing unit. But, as the Tax Court pointed out, the petitioners offer no evidence to show the number of such chosen animals or, indeed, that there were any such. In any event it is clear that the number of such animals was limited. Not only were the bulk of the animals raised by petitioners sold, but the practice of selling most of them before their breeding qualities were even tested shows that they were raised for the purpose of being sold, and not for inclusion in the producing herd.

The Tax Court allowed the taxpayers to treat as a part of the breeding herd all animals held by the taxpayers until the age when their ability to produce calves was proven; even though the animals might have been sold the very next day and although petitioners had never intended to include them in their producing herd. In so doing we think that the court gave these petitioners even more than was required by the facts shown.

We have examined the case of Albright v. United States, 8 Cir., 173 F.2d 339, 341, which petitioners cite to sustain their contentions, but we find nothing in the opinion that is helpful to petitioners. The opinion in this case recites these facts.

"In his dairy operations the taxpayer maintains a herd of 36 dairy cattle, of which an average of 18 to 20 head are producers of milk which the taxpayer sells to local creameries. Calves which are not needed for the maintenance of the dairy herd at the desired number are sold on the market. Dairy cows which by reason of age, injury, or disease are unfit for maintenance in the dairy herd, or which because of decreased milk production are economically less desirable than available young stock, are sold and replaced by young stock raised by the farmer."

The court held that when cows which had been used in the dairy herd but were no longer fit for such use were sold and replaced by other stock, the sale was of property used in the trade or business and the proceeds of the sale were taxable as capital gains. It is to be noted that in the Albright case the taxpayer did not claim as a capital asset any animals except those which had actually been part of his producing herd. This is a far different situation than that in the instant case, where there was no showing that any of the animals sold were part of the producing unit and where most of them were sold at an age before they could possibly have become so.

The decisions of the Tax Court are
Affirmed.