L. D. HANCOCK AND ELAINE HANCOCK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66706.   Filed January 21, 1959.

*Carl F. Bauersfeld, Esq.,* for the petitioners.
*Lester R. Uretz, Esq.,* for the respondent.

TIETJENS, *Judge:* This proceeding involves a deficiency in income tax for the calendar year 1953 in the amount of $1,743.62.

The only issue for decision is whether cattle sold by petitioners during the taxable year were held for sale to customers in the ordinary

course of business or were held for breeding purposes within the meaning of section 117(j) of the 1939 Internal Revenue Code.

FINDINGS OF FACT.

The stipulated facts are so found, and are incorporated herein by this reference.

During the taxable year, L. D. Hancock (hereinafter referred to as the petitioner) and Elaine Hancock, husband and wife, resided in Tupelo, Mississippi. They filed a joint Federal income tax return for that year with the director of internal revenue for the district of Mississippi, at Jackson, Mississippi.

Prior to, and during 1953, petitioner was the proprietor of a wholesale dry goods business and also was engaged in the business of farming and raising Polled Hereford cattle. For each of the years 1950 through 1953, petitioner reported the following income or loss from his wholesale business and from the operation of his farm and cattle business:

| Year | Wholesale business | Farm and cattle operations |
|------|------|------|
| 1950 | $43,013.78 | ($10,376.85) |
| 1951 | 49,579.12 | (15,858.72) |
| 1952 | 59,965.03 | (44,173.50) |
| 1953 | 36,376.39 | (40,447.09) |

In March of 1950, petitioner entered the business of raising and breeding registered cattle through the purchase of 23 head of registered Polled Hereford cattle. His intention was to build one of the top registered herds in his section of the country. No predetermined limit was set on the size of his breeding herd; rather, he wished to increase its size to the point where it could be operated in the most efficient and economical manner.

When petitioner first began his cattle operations, he owned approximately 50 acres of land. By the close of 1953, his herd had increased to 331 head of cattle, and he employed some 650 acres of land in his farming operation. As of March 10, 1958, the date of trial herein, his herd had increased to approximately 525 head, and he employed some 1,150 acres of land in his farming activities.

At all times material hereto, petitioner was a member of the American Hereford Association and the American Polled Hereford Association. All the cattle which he raised were registered with those associations. The rules of the American Hereford Association provide that if a bull is bred before it is 12 months of age, or a heifer is bred before it is 15 months of age, the offspring cannot be registered.

In order to better the quality of his herd, petitioner, from time to

time, purchased additional cattle to improve bloodlines and to be used for crossbreeding purposes. In addition, he followed the practice of selective breeding, which involved the planned mating of a bull and a cow so as to produce an offspring superior to both parents. This latter practice required that petitioner maintain a large number of herdsires.

Petitioner also engaged in a program of culling from his breeding herd any animal which was undesirable and did not come up to herd standards. At weaning, which occurred during the sixth to the eighth month, any animal found to be undesirable was separated from the breeding herd and was maintained in a separate pasture until its disposition. However, petitioner was not always able to determine at weaning if an animal would qualify for the breeding herd, inasmuch as defects might not become apparent until later in the animal's life. Therefore, it was his practice to cull from his herd any animal which developed defects, regardless of when the defect became apparent.

When a calf was born on petitioner's farm, it was tattooed, and if it had no outstanding defects was registered. It was then given a number and entered in petitioner's herd book. In addition to petitioner's herd book, wherein was entered all information with respect to the birth of a calf, petitioner maintained a pedigree book. This latter book contained the pedigrees of all registered animals as far back as three generations, and also contained the dates of birth and sale of each of the animals. Whenever a defect became apparent in any of the animals it was noted in both the herd and the pedigree books.

As a result of his purchase of better animals, his practice of selective breeding, and his program of culling undesirables, petitioner's breeding herd improved in quality over the years.

During the taxable year petitioner had only one herd of cattle. Set forth below is an inventory of both raised and purchased cattle held by petitioner as of December 31, 1950, 1951, 1952, and 1953, as well as the cattle which died or were sold during each of those years:

| Year | Purchased | | | Raised | | | Sold or died | | | Total on hand | | | Grand total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cows | Bulls | Not registered | Cows | Bulls | Not registered | Cows | Bulls | Not registered | Cows | Bulls | Not registered | |
| 1950 | 51 | 5 | 0 | 6 | 4 | 0 | 0 | 0 | 0 | 57 | 9 | 0 | 66 |
| 1951 | 131 | 30 | 0 | 34 | 38 | 0 | 78 | 20 | 0 | 144 | 57 | 0 | 201 |
| 1952 | 43 | 10 | 14 | 40 | 40 | 3 | 27 | 13 | 4 | 200 | 94 | 13 | 307 |
| 1953 | 42 | 2 | 0 | 53 | 41 | 0 | 48 | 59 | 7 | 247 | 78 | 6 | 331 |

During 1953, petitioner sold a total of 109 head of cattle, the gain on 82 of which he reported as a long-term capital gain. Respondent

did not disturb his treatment of the gain on the sale of 19 of those 82 animals, but determined that the gain realized on the sale of the remaining 63 represented ordinary income. All of these 63 animals had been held by petitioner over 12 months but under 25 months at the time of their sale; and all except 2 were registered cattle which had been culled from the breeding herd because they had developed defects which made them unsuitable for use in the herd. The 2 unregistered animals were nurse cows which were sold at a loss, and at the hearing herein, petitioner conceded error in reporting the loss sustained on their sale as a capital loss. None of the 63 sales was made to reduce the size of petitioner's herd. Petitioner raised 51 of the 63 head of cattle upon which he claimed capital gain; the remaining 12 were acquired through purchase.

Petitioner sold all except 3 of the 63 animals in issue at auction sales held on his farm on January 5 and April 23, 1953. Prior to each of those sales petitioner prepared a catalog setting forth a three-generation pedigree and description of each of the animals offered for sale. Those catalogs were distributed during each of the sales, and approximately 7 or 8 hundred were mailed to both commercial breeders and registered breeders prior to the January sale. Petitioner further advertised the January sale in 4 trade magazines, 1 Memphis newspaper, and several county newspapers in northern Mississippi. The April sale was advertised in 1 trade journal, and in substantially the same newspapers as the one in January.

Petitioner considered all the animals which he purchased, or which were born on his farm, to be a part of his breeding herd.

With the exception of the 2 unregistered nurse cows, the cattle here in issue were, at the time of their sale, held by petitioner for breeding purposes.

### OPINION.

The issue for decision is whether certain cattle sold by petitioner during 1953 were held for breeding purposes so as to constitute property used in the trade or business within the meaning of section 117 (j)(1) of the 1939 Code, thus entitling petitioner to treat the gain realized upon their disposition as a long-term capital gain. The question is one of fact. *Biltmore Company* v. *United States*, 228 F. 2d 9 (C.A. 4, 1955); *Gotfredson* v. *Commissioner*, 217 F. 2d 673 (C.A. 6, 1954), affirming a Memorandum Opinion of this Court dated August 31, 1953, certiorari denied 350 U.S. 846 (1955); *McDonald* v. *Commissioner*, 214 F. 2d 341 (C.A. 2, 1954), reversing 17 T.C. 210 (1951); *Fox* v. *Commissioner*, 198 F. 2d 719 (C.A. 4, 1952), affirming 16 T.C. 854 (1951); *John L. Clark*, 27 T.C. 1006 (1957); *James M. McDonald*, 23 T.C. 1091 (1955); *Estate of C. A. Smith*, 23 T.C. 690 (1955); *Albert T. Erickson*, 23 T.C. 458 (1954).

Respondent contends petitioner's operations clearly indicate that he was in the business of selling breeding cattle, and not merely a casual vendor of inferior animals culled from his breeding herd. He further contends that the cattle here in issue were held by petitioner for sale to customers in the ordinary course of that business. While acknowledging that the courts have rejected the "use test" as being the sole determinant as to whether cattle were held for breeding purposes, he argues that actual use is still the best evidence of the purpose for which the animal is held. Maintaining that the record does not conclusively establish that any of the animals in issue were actually used in the breeding herd, respondent submits that petitioner's testimony that he considered them a part thereof is nothing more than an attempt to bring himself within the intendment of section 117(j)(1) simply for the asking. For the reasons hereinafter set forth we do not agree.

Essentially, little difference exists between respondent's present position and that taken by him in *James M. McDonald, supra*. There his principal contention was that inasmuch as none of the cattle under consideration had been actually used in the breeding herd, petitioner was precluded from claiming that they were held for breeding purposes at the time of their sale. Furthermore, he argued, that since it could be predicted that at least some of the calves raised each year would be sold due to the development of undesirable characteristics before being put to use in the breeding herd, they therefore constituted property held primarily for sale. In rejecting those arguments we said, in part, 23 T.C. at 1099:

It is not necessary that an animal reach maturity and produce a calf for it to fall within the wording of that section [117(j)(1)]. The animal need not have been actually put to the prescribed use if it was in fact *held for the purpose of being put to that use.* * * * Actual use, of course, is an evidentiary factor to be taken into account in determining the factual question of the purpose for which the animal was held, but it is not the sole determinative. Moreover, we agree with the Court of Appeals in the prior case that it cannot be said that the raised calves were held primarily for sale merely because it could be predicted that some would be sold each year. * * *

We then went on to hold that the taxpayer there had established to our satisfaction that the animals in question were held for breeding purposes prior to their sale, a holding based in part upon evidence of the taxpayer's practice of selective breeding, culling of undesirable animals from the herd, and sale of only those animals which failed to meet established herd standards. Factually, we see little distinction between that case and the instant proceeding.

Prior to and during the years in issue, petitioner was engaged in the process of building a prime breeding herd of registered Polled Hereford cattle. His only herd was devoted to the achievement of

that end. He was constantly striving to improve its quality through selective breeding practices and through continual culling of undesirables. Every animal acquired, whether by birth or purchase, was considered by him to be a part of that breeding herd. If it developed a defect which rendered it unsuitable for use in the herd, it was culled and placed in a pasture apart therefrom to await its ultimate disposition. Had the animal not developed the undesirable characteristic it would have continued to have been held for the purpose of being put to use in the breeding herd. Furthermore, the only sales under consideration were of those culled animals which failed to measure up to herd standards. In the light of the record as a whole, including but not limited to these enumerated facts, we have found as a fact, and now hold, that the animals under consideration were, at the time of their sale, held for breeding purposes.

Respondent's position seems to have been influenced in part by the method of advertising utilized by petitioner with respect to the sales in issue. Petitioner's explanation was that he was a new breeder, and that his herd had not become well enough known to attract the necessary purchasers without the use of the advertising medium. As we view the situation, petitioner was merely using the most advantageous method of disposing of the unwanted culls. We are therefore convinced that his limited use of printed pamphlets, trade journals, and newspapers, to advertise the January and the April auctions, did not operate to change the character of the animals sold from cattle held for breeding purposes to cattle held for sale to customers in the ordinary course of business.

Respondent's reliance upon our holding in *John L. Clark, supra,* is misplaced. There the purchasers were allowed to purchase any animal in the entire breeding herd, and were not restricted in choice to the culls from that herd, which had developed undesirable characteristics. Furthermore, the taxpayer's inventory of cattle in that case declined rather than increased during the period in issue. Finally, the taxpayer in *Clark* advertised extensively throughout the entire taxable period, a fact clearly not present in the present proceeding. We think there is a clear distinction between that case and the instant one.

We cannot agree with respondent that petitioner has brought himself within the purview of section 117(j)(1) solely for the asking. Apparently that contention is premised on petitioner's argument that he considered every animal acquired to be a part of his breeding herd. True, that is one of the factors influencing the result which we have reached, but it is not the only one. Petitioner's affirmative acts of culling undesirables from the breeding herd; segregation of the culls from that herd until disposition; sale of only the culled animals; and

continual increase of the size of that herd all are corroborative of his stated intention. In effect, petitioner's entire method of operation has led us to the ultimate finding that the cattle here in issue were held for breeding purposes at the time of their sale.

Finally, we note that this is not the case of a successful cattle breeder who is also profitably engaged in the day-to-day business of selling breeding cattle. Cf. *M. P. Moore*, 31 T.C. 735 (1959). Rather, petitioner maintained only one herd which he devoted exclusively to breeding purposes. Moreover, his efforts were directed solely towards the maintenance and improvement of that herd. He had entered the cattle business only shortly before the years in issue, and consequently had just begun to establish himself as a breeder. Hence we do not regard his contention that he was holding each animal acquired for breeding purposes as unrealistic.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: The petitioner contemplated when he went into this business that he would be able to sell some of his animals at a profit even while he was building up his herd, and it is unrealistic to regard all of his animals sold as a part of his breeding herd.

WITHEY, *J.*, agrees with this dissent.