MCKINLEY KIRK AND DORIS KIRK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5875–64.   Filed November 21, 1966.

*John A. Dunkel* and *Michael D. Rose*, for the petitioners.
*Rodney G. Haworth*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the taxable years 1960 and 1961 in the amounts of $5,059.93 and $4,456.32, respectively.

The issue for our consideration is whether petitioners are entitled to treat the gains realized from the sale of horses in the taxable years 1960 and 1961 as long-term capital gains under section 1231(a), I.R.C. 1954.[1]

FINDINGS OF FACT

Some of the facts are stipulated and the stipulated facts are incorporated herein by this reference.

Petitioners McKinley and Doris Kirk are husband and wife, with their principal address at Box 338, Washington Court House, Ohio. Petitioners filed their joint Federal income tax returns for the taxable years 1960 and 1961 with the district director of internal revenue, Cincinnati, Ohio.

During the taxable years 1960 and 1961, and continuously since 1945, McKinley Kirk (hereinafter referred to as petitioner) owned, bred, raised, and trained racing harness horses on his farm at New Holland, Ohio. He also raced his horses in harness races at tracks in Ohio and elsewhere in the eastern part of the United States throughout this period. Petitioner also owned an interest in a parts store and a furniture store in 1960 and 1961 but he was not active in the management of either of these businesses. Petitioner's herd of racing horses increased gradually in size during the period 1945 through 1961.

Petitioner has conducted all of his horse breeding and training operations at his farm in New Holland, Ohio. Petitioner has a large stable, a training track, and other outbuildings appurtenant to the business of raising and training racehorses at this farm, and petitioner does not use the farm for any other farming or commercial purpose. Approximately 12 men were employed at petitioner's farm as grooms, trainers, feeders, caretakers, and handymen during the years here involved. Petitioner spent most of his time at this farm and personally trained and observed the horses daily.

Some of the horses at petitioner's farm were owned solely by petitioner and some of them were owned jointly by petitioner and others. Petitioner's reason for joint ownership of horses is to share the expenses of breeding, raising, training, and racing. His coowners' reasons for joint ownership are virtually the same, that is, to share expenses and to participate in petitioner's ability to successfully breed, raise, train, and race horses. The horses which petitioner owns alone and the horses he owns jointly with others are treated in the same manner by petitioner in breeding, raising, training, and racing them. Petitioner makes all decisions regarding all the horses raised and trained on his farm.

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

Since 1945 petitioner's horses [2] have won hundreds of racing awards and trophies. Petitioner's racing colors are on display at the Harness Racing Hall of Fame in Goshen, N.Y. Petitioner has bred, raised, trained, and raced four world champions: Floating Dream, Pleasant Surprise, Flaming Arrow, and Hodgen. Petitioner has also bred, trained, and raced four horses which have been named "Ohio Horse of the Year": Floating Dream (1950); Timesquare (1955); Flaming Arrow (1956); and Great Pleasure (1961). The Ohio Horse of the Year Award is made by the U.S. Trotting Association through a vote of its members in the State of Ohio. Great Pleasure was also named the "Aged Trotter of Ohio" in 1961. This is an award presented by the Ohio Harness Horsemen's Association, also as a result of a ballot of its members.

Between 1945 and 1961 petitioner's horses have won racing purses totaling $456,769. The number of horses in petitioner's stable raced each year, the number of starts, and the yearly winnings were as follows:

| Year | Number of horses raced | Number of starts | Winnings |
|---|---|---|---|
| 1945 | 5 | No record | $8,801 |
| 1946 | 3 | ___do | 7,141 |
| 1947 | 4 | ___do | 5,812 |
| 1948 | 3 | ___do | 10,393 |
| 1949 | 4 | ___do | 14,432 |
| 1950 | 3 | ___do | 17,515 |
| 1951 | 3 | 48 | 37,418 |
| 1952 | 8 | 149 | 41,820 |
| 1953 | 7 | 129 | 30,454 |
| 1954 | 4 | 46 | 9,256 |
| 1955 | 4 | 49 | 7,775 |
| 1956 | 2 | 29 | 16,239 |
| 1957 | 6 | 62 | 14,174 |
| 1958 | 4 | 81 | 41,776 |
| 1959 | 8 | 114 | 50,002 |
| 1960 | 13 | 244 | 64,677 |
| 1961 | 15 | 249 | 79,084 |
| Total | | | 456,769 |

Petitioner races his horses in Ohio, Kentucky, New York, Pennsylvania, Michigan, Indiana, Illinois, Missouri, and California at such racetracks as Roosevelt Raceway; Yonkers Raceway; Arden Downs; Lexington, Ky.; and Delaware, Ohio.

Petitioner drives most of his own horses at these races. Petitioner has several times been ranked nationally among the top 20 amateur and professional drivers in the United States and six or seven times petitioner has been named the best amateur driver of the year.

The books and records of petitioner reflect that at the end of 1960

---

[2] We will refer herein to all horses raised and trained on petitioner's farm and all horses raced by him as "petitioner's" or "his" horses whether they were owned by petitioner alone or jointly with others.

and 1961 he had on hand 69 and 72 horses, respectively, and that the use while held of these horses was as follows:

| Year | Total horses on hand (Dec. 31) | Use while held | | | | |
|---|---|---|---|---|---|---|
| | | Trained and raced | Trained, raced, and bred | Bred only | Trained only | Not trained, raced, or bred |
| 1960 | 69 | 16 | 23 | 20 | 7 | 3 |
| 1961 | 72 | 13 | 23 | 23 | 10 | 3 |

Petitioner actively participated in training the horses himself. Petitioner usually arose at 5:15 each morning and spent most of the day working with the horses at the farm. Most of the horses in training at the farm, except those in pasture, were run approximately 5 miles around the track every day. Petitioner ran some of the horses himself and went at least 40 miles a day in this manner. Petitioner had two or three other men who helped him run the horses.

Foals were usually dropped in the spring of the year at petitioner's stable and they are weaned in October. As of the first of the year they are regarded as being 1-year olds without reference to their actual date of birth and become known as yearlings. They are then separated according to sex and allowed to develop. During this time petitioner observes the yearlings daily for physical defects and undesirable characteristics which might ultimately prevent them from being raced.

About 12 to 14 yearlings are foaled on petitioner's farm each year. In October of the year following birth petitioner starts to train the yearlings by "breaking" them. This phase of the training program includes putting the harness on the yearling, hooking the horses to a cart, and walking and pacing the horse around the track for a few days. Later in the fall petitioner starts driving the horses which he wishes to train for the coming season around his track for 5 miles each day. This is a muscle-conditioning program called "legging." This part of their training continues until March.

In March petitioner begins a phase of training known as "repeating" the horses. From then until June each of petitioner's horses in training is driven around the training track for a 1-mile sprint and is then allowed to rest. This routine is repeated until each horse has run approximately 4 miles a day. The purpose of this phase of the training is to determine which horses can run the mile in at least 2 minutes 10 seconds, which is the time petitioner's horses must run before he thinks they are qualified to be entered in races.

In June petitioner begins racing the horses which are able to run the mile in the required racing time or which petitioner believes have the potential to run the mile in that time sometime during the racing

season. Those horses which cannot run fast enough but which petitioner believes have racing potential for the next season are turned out to pasture until fall when they again are placed in petitioner's training program for the next year's races.

At the end of the racing season the horses which have raced are returned to petitioner's stable for several months of rest. After the period of rest these horses are again placed in petitioner's training program early in the following year along with the yearlings and the horses which petitioner believes have racing potential but which were not good enough to race during the preceding summer season.

A horse is culled and sold when petitioner determines that it does not have the potential to be a successful racehorse. Among the undesirable qualities which petitioner considers in determining whether or not to cull a horse are poor conformation, particularly in the legs and body, lack of soundness, such as lameness or soreness, bad temperament, or poor tractability, and most important, lack of speed, specifically the inability to run the mile in 2 minutes 10 seconds.

All yearlings foaled at petitioner's stable are trained for racing unless they develop defects which lead petitioner to believe they will never be racehorses. From the time they are weaned until the fall following the year of their birth they are observed by petitioner for their qualities as racehorses. The earliest time in their development when petitioner can begin to form a judgment as to whether they will be trained for racing or culled out is around July of the year following their birth. Petitioner is then able to observe their conformity, legs, and body, and the yearlings then begin to develop "splints" or "curbs."

Petitioner screens his horses in the fall of the year. By then he is able to arrive at a judgment on the yearlings and some are culled out. He also decides whether or not to start retraining, in the program which is then about to begin, those horses which have been trained before but which have never raced. He also culls those horses which have been racing during the past summer but which have not been successful. All other horses are retained by petitioner.

Petitioner trains his horses for the purpose of racing them. They are not trained to enhance their sale value. Petitioner believes that training a slow horse demonstrates its lack of speed which makes it less valuable than a horse with unknown qualities.

During the taxable years 1960 and 1961 petitioner sold most of his culls at general horse auctions such as Success Acres and Old Glory where all types of horses are sold. These auctions are held in the fall and in the spring. Petitioner prefers to sell his culls at general auction sales because at such auctions petitioner is not required to make any representations other than as to a horse's eyes and wind. Peti-

tioner does not sell his horses at yearling sales where only yearlings are sold. The following horses sold in 1960 were sold at general auction: Theresa Hodgen, Hodgen's Delight, Guestmaster, and Everything. All of the horses sold in 1961, with the exception of Mahone Time, were sold at general auction.

To carry on his training and racing program petitioner owns various training and racing equipment, such as carts, sulkies, harnesses, and miscellaneous tack. During 1960 and 1961 petitioner owned at least eight sulkies, which cost about $400 each.

Petitioner generally replaces two sulkies each year. Petitioner also owns at least 20 sets of harness, which cost between $160 and $225 a set, and he replaces each set about every third year.

For every two horses which petitioner takes to racetracks, he owns a trunk in which the supplies (harness, hobbles, boots, and blankets) of these horses are placed and carried.

In addition to the cost of equipment, petitioner has other items of expense in breeding, training, and racing his horses. Among these items are feed, shoeing, veterinary fees, and costs for transportation to and boarding at racetracks during the racing season. It costs petitioner approximately $45 a month to keep a horse which is not training or racing, approximately $140 a month to keep a horse which petitioner is training, and about $350 to board a horse at a racetrack during the racing season.

The usual pattern of individuals who breed harness horses for the principal purpose of selling them rather than racing them is to sell all their horses, except those retained as brood mares, at yearling sales. They do not train their horses for racing and do not maintain training tracks or have any of the equipment used by petitioner such as sulkies, jog carts, and the like.

With respect to the horses sold by petitioner in 1960 and 1961 the pertinent data is as follows (as reflected on stipulated Exhibit C):

| Name of horse | Sex | Interest held | Date acquired | Date sold | Holding period (month) | Where sold | Sales price (100 percent) | Net grain of McKinley Kirk |
|---|---|---|---|---|---|---|---|---|
| *1960* | | | | | | | | |
| Anna Abbe | M | ½ | June 1956¹ | January 1960 | 43 | | $7,500 | $3,225.00 |
| Welcome Stranger | H | ½ | April 1957 | September 1960 | 41 | | 12,500 | 6,250.00 |
| Honest Time | H | ½ | March 1958 | do | 30 | | 7,500 | 3,750.00 |
| Electric | H | ½ | April 1959 | do | 17 | | 2,500 | 1,250.00 |
| Theresa Hodgen | M | Full | March 1959 | do | 18 | Success Acres | 650 | 595.50 |
| Hodgen's Surprise | H | ½ | do | October 1960 | 19 | | 8,000 | 4,000.00 |
| Hodgen's Delight | M | ½ | April 1959 | December 1960 | 20 | Old Glory | 450 | 157.88 |
| Guestmaster | H | ½ | do | do | 20 | do | 6,800 | 3,007.21 |
| Everything | H | Full | do | do | 20 | do | 4,000 | 3,519.25 |
| Total | | | | | | | | 25,754.84 |
| *1961* | | | | | | | | |
| Sterling Hodge | H | Full | May 1961¹ | September 1961 | 4 | Success Acres | 600 | 63.00 |
| Miss Tabulator | M | Full | April 1960 | do | 17 | do | 650 | 610.50 |
| Royal Surprise | H | ½ | March 1960 | do | 18 | do | 1,600 | 756.50 |
| Janet's Timesquare | G | Full | March 1959 | October 1961 | 31 | do | 800 | 472.00 |
| Mr. John J | H | ½ | May 1959 | do | 29 | do | 800 | 378.50 |
| Mr. Jim G | H | ½ | June 1958 | do | 40 | do | 1,400 | 663.50 |
| The Mirage | G | ½ | April 1958 | do | 42 | do | 2,200 | 1,043.50 |
| Honest Choice | G | ½ | March 1957 | do | 55 | do | 6,700 | 3,181.00 |
| Jackson C | H | Full | March 1958 | do | 43 | do | 500 | 472.00 |
| Happy Hustler | G | Full | May 1959 | do | 29 | do | 525 | 495.75 |
| Mary Belle's Bay | H | Full | March 1958 | do | 43 | do | 10,250 | 9,734.50 |
| Mahone Time | H | ½ | April 1960 | December 1961 | 20 | do | 10,000 | 5,000.00 |
| Total | | | | | | | | 22,870.75 |
| Add: 2d installment on Hodgen's Surprise | | | | | | | | 1,000.00 |
| Total | | | | | | | | 23,870.75 |

¹ These horses were purchased. All others were foaled on Kirk's farm.

Of the horses trained and sold in 1960 and 1961, the following recorded their best times for the mile as hereafter indicated, none of which times qualified them as racehorses under petitioner's requirements:

| *1960* | *Time for mile run* |
|---|---|
| Honest Time_____ | 2 minutes 25–30 seconds. |
| *1961* | |
| Janet's Timesquare_____ | 3 minutes. |
| Mr. John J_____ | 2 minutes 25–30 seconds. |
| Jackson C_____ | 2 minutes 35 seconds. |
| Happy Hustler_____ | 2 minutes 25–30 seconds. |

*Concerning the Horses Sold by Petitioner in the Year 1960*

Anna Abbe was sold to dissolve the joint ownership which existed between petitioner and another individual because personal difficulties had developed between the two. The horse won $12,274 in 1960, $6,672 in 1961, and $3,538 in 1962. Respondent does not dispute petitioner's treatment of this horse for income tax purposes.

Welcome Stranger was sold because he became lame and sore. He ran the mile in 2 minutes 12 seconds, which was 2 seconds slower than the time of 2 minutes 10 seconds in which petitioner thinks a horse should be able to run a mile to race under his ownership. Welcome Stranger raced successfully in 1960 and 1961, winning the respective amounts of $5,517 and $11,375. The horse started five times after 1962, winning a total of $969.

Honest Time was not raced by petitioner in 1960, and was sold in that year for $7,500. The horse was sold because it became lame. After the horse was sold it raced in 1960, 1961, and 1962, winning the respective amounts of $595, $13,963, and $152.

Electric was sold as a yearling in 1960 because petitioner considered the horse was mean and could not be broken. Petitioner did not race the horse because he thought his "life was worth more than that horse." The horse won $3,265 in 1962, $5,210 in 1963, and $5,950 in 1964, which did not reflect good seasons since the horse was entered only in races with large purses.

Theresa Hodgen was sold as a yearling in 1960 because petitioner thought she was too delicate to race and she had weak legs and a weak body. The horse has never been raced.

Hodgen's Surprise was sold as a yearling in 1960 for $8,000 because petitioner believed that the horse stood too straight on his front ankles to race and could not endure training. The horse has never been raced.

Hodgen's Delight was sold as a yearling in 1960 because she had internal complications which could not be diagnosed and treated. The filly was thin, never had a middle, and apparently could not breathe

properly. Hodgen's Delight raced only twice and this was after she was sold. She finished last in both races.

Guestmaster was sold as a yearling in 1960 for $6,800. The horse's hind legs were very straight, and petitioner thought that a horse with such legs could not race successfully. After he was sold Guestmaster was entered in races with large purses during 1961, 1962, and 1964, winning the respective amounts of $7,311, $7,007, and $300.

Everything was sold as a yearling in 1960 for $4,000. The horse had not been trained because petitioner thought the horse developed a body like a draft horse and its legs would have broken down in racing such weight. The horse has never been raced.

### Concerning the Horses Sold by Petitioner in 1961

Sterling Hodge is not in issue herein because the gain on his sale was reported as short-term capital gain. Petitioner received the horse in payment of a loan and sold the horse to liquidate the payment.

Miss Tabulator was sold as a yearling in 1961 because she was a test foal. Her mare could not get in foal so petitioner turned the mare out with the horses. Miss Tabulator was also poorly gaited. She has never raced.

Royal Surprise was sold as a yearling in 1960 because of accidental inbreeding. Petitioner did not want to retain an inbred filly. Royal Surprise started 36 times in 1963, winning $4,519. In 1964, she started once, winning $392.

Janet's Timesquare was sold because petitioner thought she was too slow. The mare never ran the mile in less than 3 minutes. She has never been raced.

Mr. John J. was also sold because petitioner thought he was too slow. Petitioner entered the horse in several qualifying races for no purse. The horse was unable to run the mile in less than 2 minutes and 25–30 seconds. The horse has never raced other than in the qualifying races mentioned above.

Mr. Jim G. was sold because petitioner thought he was a mediocre racehorse and did not win enough to warrant his retention. The horse was trained 2 years by petitioner and raced in 1961 but won only $891 in 13 starts. His best time when petitioner raced him was a mile in 2 minutes 13 or 14 seconds. Subsequently, the horse won $1,812 in 7 starts in 1962, $4,435 in 27 starts in 1963, and $8,683 in 37 starts in 1964.

The Mirage was also sold because it was a mediocre racehorse and did not pay its way. In 1960 The Mirage started 19 races and won $2,364. In 1961 petitioner entered The Mirage in 21 starts and it won

$2,191. Subsequently, the horse won $6,252 in 1962, $2,519 in 1963, and $3,698 in 1964, in 32, 14, and 28 starts, respectively.

Honest Choice was sold in 1961 because of the difficulty which petitioner had in handling the horse. Petitioner trained the horse 3 years and in 14 starts in 1961 the horse won $2,697. Subsequently, Honest Choice won $20,846 in 19 starts in 1962, $15,535 in 23 starts in 1963, and $1,169 in 11 starts in 1964.

Jackson C. was sold because he was too slow to race. His best time for the mile was 2 minutes 35 seconds. The horse has never been raced.

Happy Hustler was also too slow to race. The horse started 27 times in 1963 and 31 times in 1964 but won only $2,292 and $1,503, respectively.

Mary Belle's Bay was sold by petitioner in 1961 for $10,250 because he injured his ankle. Petitioner raced Mary Belle's Bay 17 times in 1960, winning $3,811, and 25 times in 1961, winning $9,665. The horse never raced after he was sold by petitioner.

Mahone Time was sold as a yearling in 1961. Petitioner was approached by an individual who asked petitioner what he would sell the colt for. Petitioner did not want to sell the colt so he priced Mahone Time at $10,000, twice what he believed the colt was worth. The individual accepted the offer. Mahone Time started 10 times in 1961, 10 times in 1962, and 22 times in 1964, and won only $1,012, $2,372, and $5,937, respectively.

None of the horses sold by petitioner in 1960 or 1961 were used by him for breeding purposes.

On their income tax return for 1960 petitioners reported ordinary income from partnerships totaling $28,887.07 and from interest totaling $5,851.10. They also reported long-term capital gain from the sale of racehorses totaling $25,754.84, one half of which, or $12,877.42, was carried into income. The names of the horses sold were not specified on the return and a cost basis of only $750 was claimed for one horse, the rest being reported as "raised" with no cost claimed. They also reported an ordinary net loss from a business or profession, designated as "Merchant Dealer" on Schedule C of the return, in the amount of $22,853.40. This resulted from reported gross receipts of $129,407.66, cost of goods sold of $73,680.01, and other business deductions totaling $78,581.05. The latter included depreciation claimed on farm equipment, farm buildings, office equipment and office building, truck equipment, and "Breed. Invest."

On their income tax return for 1961 petitioners reported ordinary income from interest, totaling $3,765.24, and from partnerships, totaling $26,554.56. They also reported long-term capital gains and losses on the sale of unnamed horses in the net amount of $23,348.15, against

which had been a charge of only $500 as the cost of one horse. They also reported a net loss from business or profession on Schedule C of the return in the amount of $22,065.71, resulting from total receipts of $124,644.30, cost of goods sold of $66,787.05, and other business deductions totaling $79,922.96. The other business deductions included depreciation claimed on items similar to those mentioned with respect to the 1960 return. The type of business activity was not indicated on this return.

In his notice of deficiency respondent determined that the profit realized by petitioners from the sale of horses in both of the taxable years 1960 and 1961 was taxable as ordinary income rather than capital gain. These were the only adjustments made by respondent in his notice of deficiency.

### ULTIMATE FINDINGS

During the years 1960 and 1961 petitioners were primarily engaged in the business of breeding, raising, and training harness horses for the purpose of racing them, and the horses sold by petitioners in 1960 and 1961 were not held by petitioners primarily for sale to customers in the ordinary course of their trade or business.

### OPINION

The sole issue is whether gains realized by petitioner on the sale of the horses he sold during the years 1960 and 1961 (exclusive of Anna Abbe and Sterling Hodge) qualified for capital gains treatment under section 1231(b)(1) as gains on the sale of assets used in a trade or business of a character subject to the allowance for depreciation, or whether the horses sold were held by petitioner primarily for sale to customers in the ordinary course of his trade or business so that the gains realized thereon are taxable as ordinary income. The horses sold were not capital assets as defined in section 1221 because they were property used in petitioner's trade or business of a character subject to the allowance for depreciation. Sec. 1221(2).[3] Neither were they livestock held by the taxpayer for draft, breeding, or dairy purposes so as to qualify the gain for capital gains treatment under section 1231(b)(3). But the fact that the horses sold did not qualify under section 1231(b)(3) does not preclude them from qualifying as property used in the trade or business of a character subject to the allow-

---

[3] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business) but does not include—

\*    \*    \*    \*    \*    \*    \*

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

ance for depreciation under the general definition contained in section 1231 (b) (1).[4] See *Anderson Fowler*, 37 T.C. 1124.

Section 1231 (a) provides that if during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the involuntary conversion of property used in the trade or business and capital assets held for more than 6 months, exceed the recognized losses from such sales, exchanges, and conversions, then such gains and losses shall be considered as gains and losses on the sales or exchanges of capital assets held for more than 6 months.

Section 1231 (b) defines the term "property used in the trade or business," for purposes of this section, as "property used in the trade or business, of a character * * * subject to the allowance for depreciation, * * * held for more than 6 months * * * which is not * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." If petitioner was in the business of racing horses, the horses used in that business are of a character subject to the allowance for depreciation, where not included in inventory for purposes of computing tax. See sec. 1.167 (a)–6(b), Income Tax Regs. All of the horses involved in the controversy before us were held by petitioner for more than 6 months and thus qualify under the definition in section 1231 (b) if petitioner was in the business of racing horses and the horses sold were used in that business, and if they were not held primarily for sale to customers in the ordinary course of petitioner's business.

---

[4] SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

\*     \*     \*     \*     \*     \*     \*

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

\*     \*     \*     \*     \*     \*     \*

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

\*     \*     \*     \*     \*     \*     \*

(3) LIVESTOCK.—Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.

In our opinion there can be little doubt that petitioner was in the business of racing horses for profit. The record shows that during the period 1945 through 1961 petitioner had entered horses owned and/or trained by him in numerous races throughout the eastern part of the country, and these horses had won close to a half-million dollars in purses. During 1960 and 1961 his horses were entered in 244 and 249 races, and won purses totaling $64,677 and $79,084, respectively. Prior to and during the years in issue, petitioner systematically engaged in building a prime stable of racing harness horses and his daily activities and those of his employees were devoted to the achievement of that end. He was constantly striving to improve the quality of his horses through selective breeding and continual culling of horses with undesirable characteristics for racehorses. He studied his horses for racing qualities to discover defects or unsatisfactory traits which might ultimately prevent them from attaining his particular standards of racing ability. His training routines were all directed toward producing horses with the speed, stamina, and tractability to win harness races. He sold as yearlings only those horses which for one reason or another he felt fairly sure would not develop into good racehorses. Those that he was not sure of he retained until the next training season and put them through another training course to determine whether they could develop the speed and other characteristics he required in a horse before he raced him. His better horses he kept and raced until such time as he felt the horses had lost their racing potential or would not pay off as racehorses.

Petitioner also invested considerable sums of money, not only in training equipment, but primarily in harness-racing equipment. He drove a good number of his own horses in races himself, and he also drove horses owned by others in races, as an amateur, and has been recognized as one of the best drivers in the United States. Some measure of his success as a horse racer, although not necessarily monetarily, is the fact that he owned and/or trained four world champion trotting horses, and his racing colors are on display in the Harness Racing Hall of Fame in Goshen, N.Y. In addition to the above, one could hardly observe petitioner on the witness stand without being convinced that his prime interest in life for a number of years has been breeding, raising, and training horses to race and that this is a business with him. Petitioner has an interest in several other businesses but he pays little attention to them; training horses to race and racing them is his principal business.

Respondent's argument is twofold. He argues that petitioner races his horses in order to enhance the reputation of his herd as good racing stock to increase their value for sale purposes, which is his principal reason for raising and holding them. He claims that petitioner

realized more net income from the sale of the horses he sold in 1960 and 1961 than he realized from racing his horses in those years. It is impossible to determine from the record whether this is correct. In his system of bookkeeping petitioner charged none of the cost of breeding, raising, training, or other costs of operating the farm against any particular horse. Consequently, unless petitioner had acquired by purchase one of the horses that was sold, no cost was charged against it and the entire sales price was reflected as gains. Conversely, the cost of raising the horses sold must be included in the cost of operating petitioner's racing business or other businesses and would reduce the net income shown from those sources. We are not concerned here with whether this is the correct method of accounting for petitioner to use, but mention it only in reply to respondent's argument.

Respondent cites *Robert B. Jewell*, 25 T.C. 109, and *Nowland* v. *Commissioner*, 244 F. 2d 450 (C.A. 4, 1957), affirming a Memorandum Opinion of this Court, in support of this point. In the *Jewell* case the petitioner was raising a breeding herd of racehorses for ultimate sale rather than to race them himself, and in fact he raced very few of the horses he raised. In view of the fact that his ultimate purpose was admittedly to sell the horses and the fact that he sold most of his horses during their yearling year regardless of defects, etc., we held that 8 of the 11 horses he sold during the year involved were held primarily for sale in his business of selling horses, while the other 3, which petitioner had either raced or trained for racing before discovering their defects, were being held for breeding purposes at the time they were sold. We think the *Jewell* case is clearly distinguishable from this case on the facts.[5] The *Nowland* case is likewise distinguishable on its facts and is not controlling here. There the taxpayer also claimed that the horses sold were part of his breeding stock (rather than racing stock, as here), but the court held that inasmuch as he annually sold all of his yearlings at advertised sales, and bought some of them back which he retained, the horses sold were held primarily for sale in the ordinary course of his business.

Respondent's second argument is that even if petitioner was in the business of racing horses, he was also in the business of selling horses subject to the condition that they would be used as racehorses if they met the standards set by petitioner, and that the horses here involved did not qualify as racehorses under the standards established by petitioner so they were sold in the ordinary course of that business. Respondent relies principally on *Gotfredson* v. *Commissioner*, 217 F. 2d 673 (C.A. 6, 1954), in support of this argument. We think respondent

---

[5] *Robert B. Jewell*, 25 T.C. 109, was also distinguished on the facts in *Neil S. McCarthy*, a Memorandum Opinion of this Court, in which the facts were very similar to the facts in this case.

misconstrues the principal objective of all of petitioner's activities related to his horses, and that respondent's reliance on the *Gotfredson* case cited above is misplaced.

The first part of respondent's argument is based on the mistaken assumption that petitioner's principal purpose in raising, training, and racing horses was to sell horses and enhance their sale value. For reasons heretofore stated we are convinced that petitioner's principal purposes in raising and training horses was to race them and that the selling of horses was a necessary incident to that principal business. We recognize that petitioner may have had more than one purpose in breeding and training the horses, see *Municipal Bond Corp.*, 46 T.C. 219, on appeal (C.A. 8, Sept. 15, 1966), but we do not believe that was the case here. In our opinion all of the horses bought, bred, and trained by petitioner were bought, bred, and trained for the purpose of racing and with the intention of racing them if they qualified for that purpose. The fact that petitioner knew in advance that a good number of the horses would never develop into good racehorses and that he would have to sell them does not mean that the horses sold were necessarily held primarily for sale. *Robert B. Jewell, supra.* Petitioner's intention with respect to the reason for acquiring and holding the horses is the most important factor in this determination. *Robert B. Jewell, supra.*

Respondent's reliance on *Gotfredson* v. *Commissioner, supra,* is misplaced. Prior to the decision in that case this Court had consistently adhered to the Commissioner's so-called use test, holding that livestock did not become a part of a breeding or dairy herd until the animal had served that purpose. This Court had so held in its Memorandum Opinion in the *Gotfredson* case and also in *James M. McDonald,* 17 T.C. 210. Shortly before the Court of Appeals for the Sixth Circuit decided the *Gotfredson* case, the Court of Appeals for the Second Circuit reversed this Court in the *McDonald* case, see *McDonald* v. *Commissioner,* 214 F. 2d 341, rejecting the so-called use test and holding that if the motive of the taxpayer in raising and holding the cattle that were sold was to help build a champion herd, those cattle qualified for the benefits of the recently revised section 117(j)(1), I.R.C. 1939,[6] even though they had not reached the age, when sold, to serve in the breeding herd. The Sixth Circuit, in its opinion in *Gotfredson* v. *Commissioner, supra,* recognized the validity of the reasoning of the Second Circuit in *McDonald,* saying that if the matter were before it de novo that reasoning would be persuasive, but nevertheless affirmed the Tax Court because it was unable to say that the facts in the case did not support the factual findings of the Tax Court.

---

[6] Sec. 324 of the Revenue Act of 1951, 65 Stat. 501, retroactively amended sec. 117(j)(1) to include within the term "property used in the trade or business" "livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes."

The *McDonald* problem was again presented to the Tax Court on the same issue involving subsequent years, *James M. McDonald*, 23 T.C. 1091. In that case the Tax Court reversed its position, saying:

We are persuaded that all the raised calves here in controversy were held for breeding or dairy purposes within the meaning of sections 117(j)(1). It is not necessary that an animal reach maturity and produce a calf for it to fall within the wording of that section. The animal need not have been actually put to the prescribed use if it was in fact *held for the purpose of being put to that use*. McDonald v. *Commissioner, supra; Fox* v. *Commissioner*, (C.A. 4) 198 F. 2d 719, affirming 16 T.C. 854; *Estate of C. A. Smith*, * * * [23 T.C. 690]. Actual use, of course, is an evidentiary factor to be taken into account in determining the factual question of the purpose for which the animal was held, but it is not the sole determinative. Moreover, we agree with the Court of Appeals in the prior case that it cannot be said that the raised calves were held primarily for sale merely because it could be predicted that some would be sold each year.[5] See also *United States* v. *Bennett*, (C.A. 5) 186 F. 2d 407. [Footnote omitted.]

This Court has since adhered to the position it took in the second *McDonald* case, see *Estate of C. A. Smith*, 23 T. C. 690; *L. D. Hancock*, 31 T.C. 752; *Richard P. Tesche*, 33 T.C. 122, and the Commissioner has acquiesced therein. 1956–1 C.B. 4. The Commissioner has also provided in section 1.1231–2 (b), Income Tax Regs. :

However, a draft, breeding, or dairy purpose may be present if an animal is disposed of within a reasonable time after its intended use for such purpose is prevented or made undesirable by reason of accident, disease, drought, *unfitness of the animal for such purpose, or a similar factual circumstance.* * * * [Emphasis supplied.]

We think the principle enunciated in the above cases applies with equal force to animals raised and held for racing purposes.

To complete the cycle of the *Gotfredson* case relied on by respondent, the tax liability of the Gotfredsons for subsequent years was again before the Sixth Circuit in *Gotfredson* v. *United States*, 303 F. 2d 464. Although the court did not overrule the earlier *Gotfredson* case, it cited the Second Circuit *McDonald* case with approval, noting that the record before it on this occasion indicated that the taxpayers had followed the practice, as they had in the *McDonald* case, of culling from the herd, as soon as feasible, those calves which did not measure up to the high standards of the herd, and that the jury should have been instructed concerning the purpose and motive for which the cattle were held in the light of those facts and circumstances. In short, we do not think the first *Gotfredson* case necessarily supports respondent's position on this point.

It is our conclusion from all the evidence that it was petitioner's motive and intent in the years here involved to include all of the horses he raised and trained in his racing herd if they met his qualifications for this purpose. The horses here involved were held for that purpose until such time as petitioner discovered the defects which led to his

culling them from the herd and selling them. These horses were sold by petitioner at general auction sales as soon as feasible, unlike the custom of persons in the business of holding horses for sale who generally sell them as yearlings in yearling sales. While petitioner undoubtedly recognized that each year he would have to cull and sell some of his horses, this was merely incidental to, and an integral part of, his principal business of raising and training horses to race. The objective of selling these horses at a profit was not petitioner's primary or principal purpose for holding either the culls or the better horses, as required by *Malat* v. *Riddell*, 383 U.S. 569. Had sale for a profit been petitioner's primary purpose for raising, training, and racing his horses, it is likely that he would have sold his better horses rather than the culls because they would undoubtedly have produced a greater profit. There is no evidence that petitioner either advertised that he had horses for sale or permitted a prospective buyer to choose any horse he desired from the herd to purchase. Instead, petitioner sold only the horses he considered defective and he sold those at general auction sales where he had to make representations only with respect to the horses' eyes and wind.

We conclude that the gain on the sale of the horses here involved, which were property used by petitioner in his trade or business of raising and training horses to race, which had been held for more than 6 months, and which were property of the character subject to an allowance for depreciation, and which were not property held primarily for sale to customers in the ordinary course of petitioner's trade or business, qualifies for the capital gains treatment provided in section 1231 (a). Consequently we hold for petitioners on this issue.

*Decision will be entered for the petitioners.*